538 F.2d 1108
 Fanny PAIGE et al., on behalf of themselves and all others
similarly situated, Plaintiffs-Appellees, Cross-Appellants,
v.
James GRAY, Mayor of the City of Albany, Georgia, et al.,
Defendants-Appellants, Cross-Appellees.
UNITED STATES of America, Plaintiff-Appellee,
v.
CITY OF ALBANY et al., Defendants-Appellants.
 No. 75-3314.
 United States Court of Appeals,
Fifth Circuit.
 Sept. 15, 1976.
 
 James V. Davis, Albany, Ga., for defendants-appellants.
 Ronald T. Knight, U. S. Atty., John D. Carey, Asst. U. S. Atty., Macon, Ga., J. Stanley Pottinger, Asst. Atty. Gen., Dennis Dimsey, Appellate Sec., Brian K. Landsberg, Civil Rights Div., Dept. of Justice, Washington, D. C., for United States.
 Mary M. Young, Alfred O. Bragg, III, Albany, Ga., David F. Walbert, Atlanta, Ga., for Fanny Paige.
 Appeals from the United States District Court for the Middle District of Georgia.
 Before TUTTLE, AINSWORTH and CLARK, Circuit Judges.
 CLARK, Circuit Judge:
 
 
 1
 Named black citizens of Albany, Georgia, joined by the United States, brought this class action to invalidate a 1947 law providing for at-large election of seven city officials. 1947 Ga.Laws p. 725. After finding that the at-large scheme had the inevitable effect of abridging the rights of black voters, the district court devised a plan calling for the election of five city commissioners from single member districts but preserving two positions (mayor and mayor pro tem.) to be chosen at-large. Paige v. Gray, 399 F.Supp. 459 (M.D.Ga.1975). Both sides (except for the United States) appeal. We vacate and remand for re-examination of the basis for the invalidation of the 1947 law and to provide the district court with an opportunity to reassess its adoption of a mixed single member and at-large plan in light of recent Supreme Court pronouncements.
 
 
 2
 The challenged at-large procedure was enacted by the Georgia Legislature in 1947 close on the heels of this court's eradication of all-white primaries. Chapman v. King, 154 F.2d 460 (5th Cir.), cert. denied, 327 U.S. 800, 66 S.Ct. 905, 90 L.Ed. 1025 (1946). Prior to 1947, five city commissioners had been elected on a ward basis. 1923 Ga.Laws p. 374. Since 1923, however, two commissioners had been elected at large, and since 1937, these posts have been specifically designated as mayor and mayor pro tem. 1937 Ga.Laws p. 1476.
 
 
 3
 The end of discriminatory primaries enabled black voters to participate meaningfully in the 1946 ward elections for the first time. The black-preferred candidate (a white) won in Ward 5 where blacks constituted a majority of registered voters. This new-found political strength was quickly eroded by the 1947 legislation which had the effect of transforming a black ward majority into an at-large minority. The legislators were apparently so worried about black voter control that specific provisions were enacted in the 1947 law to guard against filling vacancies in Ward 5. 1947 Ga.Laws p. 734. To compound the problem for blacks a majority vote requirement was instituted in 1959. 1959 Ga.Laws p. 2950. No black has ever been elected under the at-large plan although the population is approximately 40% black. Only seven blacks have run for office; four of these ran in primaries of the Democratic Party.
 
 
 4
 The district court's invalidation of the at-large scheme relied heavily upon Gomillion v. Lightfoot, 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110 (1960), the leading case prohibiting racial gerrymandering. Although expressly declining to rule on racial motivation or intent in the passage of the 1947 law, the court concluded that the harmful effect of the legislation caused a violation of the Fifteenth Amendment. 399 F.Supp. at 463-64. The analysis of the constitutionality of the voting statutes was halted at this point. The court refused to apply more recent Fourteenth Amendment precedents dealing with dilution of the black vote in multimember districts, stating that these cases should not be applied "retroactively" to election systems of long standing. Id. at 465-66.
 
 
 5
 The city and the private plaintiffs complain of the lower court's action. The city contests the ruling on the merits, specifically questioning the applicability of Gomillion to the facts of this case. The private plaintiffs cross-appeal solely on the issue of relief and urge adoption of a single-district plan for all seven city officials. The United States seeks an across-the-board affirmance of the district court's decision.
 
 I. Validity of the 1947 Act
 
 6
 Gomillion involved an attempt by the City of Tuskegee to redraw its municipal boundaries to exclude virtually all black voters. The Gomillion holding has most often been cited as a prohibition against racial gerrymandering or plans drawn along racial lines. See Wright v. Rockefeller, 376 U.S. 52, 84 S.Ct. 603, 11 L.Ed.2d 512 (1964); Howard v. Adams County Board of Supervisors, 453 F.2d 455, 457 (5th Cir. 1973); Sims v. Baggett, 247 F.Supp. 96, 105 (M.D.Ala.1965) (three-judge court). Since the advent of the dilution decisions there has apparently been no need to resort to Gomillion to eliminate unconstitutional at-large plans.[1] Moreover, Gomillion and its progeny have recently been interpreted to require proof of racial motivation or a showing that the election scheme was "conceived or operated as purposeful devices to further racial or economic discrimination." Whitcomb v. Chavis, 403 U.S. 124, 149, 91 S.Ct. 1858, 1872, 29 L.Ed.2d 363 (1971).[2]
 
 
 7
 Notwithstanding Gomillion's "inevitable effect" language, it is likely that the Supreme Court will require circumstantial proof of unlawful motive. See Washington v. Davis, --- U.S. ----, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976).[3] Thus absent an express finding of discriminatory purpose, the application of Gomillion to the assessment of an at-large election plan's validity may be incomplete. Since we conclude that any evaluation of the 1947 law should be made under more recent and less ambiguous precedents, we do not reach the question of whether the sequence of events leading to the passage of the 1947 Act was sufficiently suspect to compel a finding of racial motivation.
 
 
 8
 The validity of Albany's change from a ward to an at-large system can best be handled by applying the multifactor test enunciated in the recent dilution decisions of the Supreme Court and this circuit, notably White v. Regester, 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973) and Zimmer v. McKeithen, 485 F.2d 1297 (5th Cir. 1973) (en banc).[4]
 
 
 9
 The district court's concern with the retroactive application of White and its progeny in this circuit is unwarranted. Prospectivity in the context of an election law challenge relates to the current and continuing use of the challenged enactment; it does not look to the date of enactment alone. The doctrine means no more than that the results of past elections will not be supplanted by special elections.[5] It does not constitute a bar against issuing injunctions as to future elections. See Allen v. State Board of Elections, 393 U.S. 544, 571-72, 89 S.Ct. 817, 835, 22 L.Ed.2d 1 (1969). More importantly, the Supreme Court has never indicated that its dilution principles should only be used to test recently enacted provisions. To the contrary, White struck down a multimember scheme which had been in operation since at least 1914, although the specific charter provisions at issue were of more recent vintage.
 
 
 10
 The dilution decisions recognize that where multimember or at-large schemes are employed, collective strength of black voters may be diluted and the chances of electing representatives who are responsive to minority interests correspondingly lessened. To establish that a plan impermissibly dilutes, the plaintiff must show more than a mere disparity between percentage of minority residents and percentage of minority representation. The proof must affirmatively demonstrate that the affected group has less opportunity to participate in the political process. Zimmer sets the basic standard in this circuit:
 
 
 11
 Where a minority can demonstrate lack of access to the process of slating candidates, the unresponsiveness of legislators to their particularized interests, a tenuous state policy underlying the preference for multi-member or at-large districting, or that the existence of past discrimination in general precludes the effective participation in the election system, a strong case is made. Such proof is enhanced by a showing of the existence of large districts, majority vote requirements, anti-single shot voting provisions and the lack of provision for at-large candidates running from particular geographical subdistricts. The fact of dilution is established upon proof of the existence of an aggregate of these factors. The Supreme Court's recent pronouncement in White v. Regester, supra, demonstrates, however, that all these factors need not be proved in order to obtain relief.
 
 
 12
 485 F.2d at 1305.
 
 
 13
 Both the private plaintiffs and the United States seek to justify the district court's decision on the merits by applying the Zimmer factors. The weighing of these factors is ordinarily a trial court function which we will not undertake initially unless the record is so clear as to permit of only one resolution. We do not have to make this latter determination since the case must go back to the district court on the question of the propriety of providing for at-large elections as part of its remedial plan. Therefore, a remand for this inquiry also will not entail any significant increase in the chances for delay.
 
 II. Relief
 
 14
 The United States Supreme Court has very recently emphasized the rule that "when district courts are forced to fashion apportionment plans, single-member districts are preferable to larger multi-member districts as a general matter." Connor v. Johnson, 402 U.S. 690, 692, 91 S.Ct. 1760, 1762, 29 L.Ed.2d 268 (1971). Absent a finding of special circumstances or insurmountable difficulties, the court should shape its remedial plan using single-member districts only. Wallace v. House, --- U.S. ----, 96 S.Ct. 1721, 48 L.Ed.2d 191 (1976), vacating, 515 F.2d 619 (5th Cir. 1975); East Carroll Parish School Board v. Marshall, --- U.S. ----, 96 S.Ct. 1083, 1085-86, 47 L.Ed.2d 296, 299 (1976). At oral argument in this court there was much debate concerning the role of Albany's mayor and mayor pro tem. directed toward ascertaining whether these positions are so unusual or unique as to require a vote by the whole community. From that discussion we have concluded that this issue must be explored in depth by the court on remand. See Nevett v. Sides, 533 F.2d 1361, 1365-66 n.5 (5th Cir. 1976). The district court is at liberty to reopen the proof if it determines that further evidence may illuminate any issue to be decided by it. That court ultimately must apply the Supreme Court standard expressed in Connor, East Carroll, and Wallace to that completed record to determine whether any at-large elections at all should be allowed.[6]
 
 
 15
 VACATED AND REMANDED.
 
 
 16
 AINSWORTH, Circuit Judge (specially concurring):
 
 
 17
 I concur in the result. I agree that we should remand in order to afford a more complete factual record for the ultimate disposition of the apportionment scheme in the City of Albany. However, I would permit the trial judge a broader discretion than would the majority opinion. While I agree that the district court should be guided by the Supreme Court's pronouncements in Wallace v. House, --- U.S. ----, 96 S.Ct. 1721, 48 L.Ed.2d 191 (1976) (mem.), East Carroll Parish School Board v. Marshall, --- U.S. ----, 96 S.Ct. 1083, 47 L.Ed.2d 296 (1976) (per curiam), and Connor v. Johnson, 402 U.S. 690, 91 S.Ct. 1760, 29 L.Ed.2d 268 (1971) (per curiam), I disagree with the implication in the majority opinion that the lesson of those cases impels the conclusion that "the court should shape its remedial plan using singlemember districts only." As the Supreme Court's opinions make clear, the constitutionality of multi-member districting is an empirical matter, to be decided on the facts of a particular case. We leave to the district court the task of ascertaining the facts with respect to the mayor and mayor pro tem positions in Albany and of applying the controlling precedents to those facts.
 
 
 18
 "(W)hen district courts are forced to fashion apportionment plans, single-member districts are preferable to large multi-member districts as a general matter." Connor, supra, 402 U.S. at 692, 91 S.Ct. at 1762. However, that is not to say that multimember districts are automatically invalidated on constitutional grounds. Indeed, the Supreme Court expressly declined to approve that approach last term in East Carroll, see --- U.S. at ----, 96 S.Ct. at 1085, and has repeatedly announced in the past that such districts are not per se unconstitutional. See, e. g., Chapman v. Meier, 420 U.S. 1, 15, 95 S.Ct. 751, 760, 42 L.Ed.2d 766, 777 (1975); White v. Regester, 412 U.S. 755, 765, 93 S.Ct. 2332, 2339, 37 L.Ed.2d 314, 324 (1973). Although the Court has struck down certain multimember systems, see, e. g., Regester, supra; Connor, supra, it also has "upheld numerous state-initiated apportionment schemes utilizing multimember districts." Chapman, supra, 420 U.S. at 15, 95 S.Ct. at 760. In applying its rule of preference, the Court recently adopted an "unusual circumstances" test to justify the use of multimember districting. See East Carroll, supra, --- U.S. at ----, 96 S.Ct. at 1085. I am therefore concerned by the majority's imposition of a standard of "special circumstances or insurmountable difficulties," such that the mayor and mayor pro tem positions must be "so unusual or unique as to require a vote by the whole community." I fear that the language of the majority's opinion would elevate the Supreme Court's rule of preference to a mandate to the district court to impose all-single-member districting, whatever its findings might be as to the political situation in Albany.
 
 
 19
 In East Carroll, the Supreme Court held that the district court abused its discretion in not ordering a single-member reapportionment plan for the school board and police jury in East Carroll Parish, Louisiana, since "no special circumstances (t)here dictate(d) the use of multimember districts." Id., --- U.S. at ----, 96 S.Ct. at 1085. Furthermore, the challenged scheme involved an all-at-large system, and there had been a "firmly entrenched state policy against at-large elections for police juries and school boards" until shortly before the plan was initially created. Zimmer v. McKeithen, 5 Cir., 1973, 485 F.2d 1297, 1307 (en banc).[1] Thus, that case is not dispositive of the instant controversy. The "insurmountable difficulties" language incorporated in the majority's opinion herein comes from Connor. Yet, the "insurmountable difficulties" phrase was not enunciated by the Connor Court as the standard for multimember districting. Rather, the language was simply part of the instructions to the district court to implement a single-member plan in light of the particular facts presented there.[2] Id., 402 U.S. at 692, 91 S.Ct. at 1762.
 
 
 20
 In different contexts, the Court has propounded slightly different variations of the standard for adjudicating the validity of multimember districting. In Fortson v. Dorsey, 379 U.S. 433, 85 S.Ct. 498, 13 L.Ed.2d 401 (1965), for example, the Court held that Georgia's senatorial reapportionment statute, providing for multimember districting in the state's most populous counties, while other districts were arranged in a single-member plan, withstood an equal protection challenge. Although the Court was not presented with the question on the facts before it, the Fortson Court suggested a standard for a case involving racial dilution, namely, whether
 
 
 21
 designedly or otherwise, a multi-member constituency apportionment scheme, under the circumstances of a particular case, would operate to minimize or cancel out the voting strength of racial or political elements of the voting population.
 
 
 22
 Id., 379 U.S. at 439, 85 S.Ct. at 501.
 
 
 23
 In Mahan v. Howell, 410 U.S. 315, 93 S.Ct. 979, 35 L.Ed.2d 320 (1973), the Court upheld a court-ordered multimember districting plan where there was a "singular combination of unique factors" which spoke in its favor. 410 U.S. at 333, 93 S.Ct. at 989. Those factors were evidence of "substantial malapportionment" with respect to naval personnel under a single-member districting plan, the Supreme Court's prohibition of voting discrimination against military personnel, and the fear of disrupting upcoming elections by delay. Id.
 
 
 24
 A more restrictive standard applies, the Court said in Chapman v. Meier, where a federal court is "imposing" multimember districting on a state which has always employed single-member districts with respect to the offices in question (there state Senate seats), and without an offer, by the court or by proponents of the multimember scheme, of a "legitimate state interest" countervailing the Connor preference for single-member districting. 420 U.S. at 14-20, 95 S.Ct. at 760-63.
 
 
 25
 However, the Chapman Court explicitly left the door open to advocates of multimember plans:We hold today that unless there are persuasive justifications, a court-ordered reapportionment plan of a state legislature must avoid use of multimember districts . . . . Where important and significant state considerations rationally mandate departure from these standards, it is the reapportioning court's responsibility to articulate precisely why a plan of single-member districts with minimal population variance cannot be adopted.
 
 
 26
 Id., 420 U.S. at 26-27, 95 S.Ct. at 766 (emphasis added). Although the preference for single-member districting is clear, the preceding passage must inform the district court's reading of the more recent "unusual circumstances" language of East Carroll. What is called for is an open and searching inquiry into the facts and policy behind the two at-large posts in the districting scheme under consideration. Without a more complete record at this juncture of the proceedings, the panel was unable to determine whether the functions of the mayor and, in his absence, the mayor pro tem of Albany amount to "unusual circumstances," or whether there are, in other words, "important and significant state considerations rationally mandat(ing)" at-large voting for those posts. Moreover, the district court should consider on remand the Chapman Court's observation that "an example of a conceivable rationale supporting multimember districts" is the suggestion that they "may insure that certain interests such as city- or region-wide views are represented." Id., 420 U.S. at 20 n. 14, 95 S.Ct. at 763 n. 14. See Carpeneti, Legislative Apportionment: Multimember Districts and Fair Representation, 120 U.Pa.L.Rev. 666, 695-96 (1972).
 
 
 27
 Just as none of the preceding cases is dispositive, neither is Wallace v. House, supra. In Wallace, this circuit held, inter alia, that
 
 
 28
 (d)ue deference to the long-established Louisiana policy favoring at least some at-large positions in aldermanic elections leads us to conclude that the Board's preference for the mixed plan (of four single-member districts and one at-large district) must override the district court's preference for the all-single-member plan.
 
 
 29
 Wallace v. House, 5 Cir., 1975, 515 F.2d 619, 638, vacated and remanded, --- U.S. ----, 96 S.Ct. 1721, 48 L.Ed.2d 191 (1976) (mem.). The basis for the Supreme Court's decision there, vacating the judgment of this circuit and remanding the case for further consideration in light of East Carroll, is unclear, since the Court's published decision contains only a short order rather than a reasoned opinion. Yet, the Court apparently believed that the panel had not accorded sufficient weight to the Supreme Court's rule of preference for single-member districting. Wallace is distinguishable from the instant case, though, because Wallace did not present in its scheme an at-large position which was functionally different from the remainder of the aldermanic posts. It will be the responsibility of the trial court, therefore, to determine whether the two posts still in contention here do rise to the point where the rationale for at-large representation is justified under the circumstances.
 
 
 30
 The trial court also must consider, of course, any possible discriminatory effects of its mixed scheme. The burden of proof as to dilution belongs to plaintiffs. As the Supreme Court said in Chapman :
 
 
 31
 (I)t must be shown that
 
 
 32
 "designedly or otherwise, a multi-member constituency apportionment scheme, under the circumstances of a particular case, would operate to minimize or cancel out the voting strength of racial or political elements of the voting population." 379 U.S., at 439 (85 S.Ct. 498, at 501).
 
 
 33
 Further, there must be more evidence than a simple disproportionality between the voting potential and the legislative seats won by a racial or political group. There must be evidence that the group has been denied access to the political process equal to the access of other groups. White v. Regester, 412 U.S., at 765-766 (93 S.Ct. 2332) . . . .
 
 
 34
 Chapman, supra, 420 U.S. at 17, 95 S.Ct. at 761.
 
 
 35
 The Chapman Court pointed out that the evaluation of multimember districts differs "depending on whether a federal court or a state legislature has initiated the use." Id., 420 U.S. at 18, 95 S.Ct. at 762. In court-ordered plans, the preference for single-member districting applies. Id., 420 U.S. at 19, 95 S.Ct. at 762. Plaintiffs, however, continue to have the burden of proving dilution. First, the use of at-large voting for the mayor and mayor pro tem positions in Albany was initiated by the legislature, the district court's order having been addressed primarily to the remaining aldermanic posts. Second, assuming that the City demonstrates a legitimate interest in the at-large election of the mayor and mayor pro tem, plaintiffs then must show that the district court's mixed scheme minimizes or cancels out the voting strength of black residents of Albany by denying them equal access to the political process. Moreover, plaintiffs' proof as to this element of the case should speak to the effect of the plan as ordered by the district judge, rather than as initially enacted by the legislature. Cf. Turner v. McKeithen, 5 Cir., 1973, 490 F.2d 191, 196-97 & n. 23. The district judge has held the previous all-at-large system to be unconstitutional, and has fashioned his own mixed plan. The United States, which originally joined with private plaintiffs in seeking to invalidate at-large voting for all seven city officials, has not cross-appealed, and now concludes that the district court's scheme "does not dilute the voting rights of Albany's black citizens and is therefore constitutional." Brief for United States at 28-29.
 
 
 36
 While proof of past racial exclusion from the political process in Albany certainly enters into the determination, it will not suffice alone to invalidate the two remaining at-large posts. In Perry v. City of Opelousas, 5 Cir., 1975, 515 F.2d 639, a pre-East Carroll case, this circuit concluded that multimember districting under Opelousas' all-at-large aldermanic scheme had become "a certain instrument of dilution," and thus was constitutionally infirm. Id. at 641. Nevertheless, the panel upheld a district-court-adopted system of five single-member districts and one at-large district, after finding no evidence that the mixed plan would deprive Opelousas blacks of fair representation on the Board of Aldermen. The court reasoned that it was proper there to permit the one at-large seat as an accommodation to a longstanding local and state preference for at-large districting. Although this circuit relied heavily in Opelousas on the reasoning of the companion case, Wallace, 515 F.2d 619, which has arguably been disapproved by the Supreme Court's decision therein vacating and remanding, there is no conflict between the cases, given proper recognition of the Connor preferential rule in accommodating local policy.
 
 
 37
 Since East Carroll was decided, we upheld an all-at-large scheme for the election of county commission members in Gadsden County, Florida, against a dilution challenge. McGill v. Gadsden County Commission, 5 Cir., 1976, 535 F.2d 277. See also Dove v. Moore, 8 Cir., 1976, --- F.2d ----. In Gadsden County, it was established that blacks had been subjected to "an extensive history of discrimination," id., 523 F.2d at 281; however, the other elements of the Zimmer dilution standards[3] were not present. Id. at 280-81. While "reaffirm(ing) the importance of past discrimination to decisions about the dilutive effects of at-large voting schemes," id. at 281, this circuit went on to hold: "(W)e cannot say that the effects of past discrimination, in themselves, cause an at-large voting scheme to unconstitutionally deny blacks access to the political process." Id. Although we were strongly influenced by the substantial number of Gadsden County's black voters who constituted almost half of the county's registered voters and over half of the majority party membership we stressed that the significance of past discrimination in a dilution case lies in how it bears on political participation today. Therefore, Gadsden County is not distinguishable.
 
 
 38
 Finally, the district court should be guided in framing its relief by the practical realities of the situation. In considering private plaintiffs' request that all at-large posts on the City Commission be modified, the district court should inquire whether all-single-member districting is "required to remedy 'the effects of past and present discrimination' " against black residents of Albany, and to bring them into the "full stream" of the city's politics, White v. Regester, supra, 412 U.S. at 769, 93 S.Ct. at 2341; the court should not "intrude upon state policy any more than necessary to ensure representation" of those voters. Whitcomb v. Chavis, 403 U.S. 124, 160, 91 S.Ct. 1858, 1876, 29 L.Ed.2d 363, 386 (1971).
 
 
 
 [1]
 Prior to the dilution precedents, Gomillion was relied upon to invalidate a change from beat to at-large election of Democratic party officials in Barbour County, Alabama. Smith v. Paris, 257 F.Supp. 901 (M.D.Ala.1966), aff'd, 386 F.2d 979 (5th Cir. 1967). Likewise, Gomillion has been used less frequently in gerrymander cases since the courts have not hesitated to apply recent dilution cases to solve redistricting problems. Gilbert v. Sterrett, 509 F.2d 1389 (5th Cir. 1975); Robinson v. Commissioners Court, 505 F.2d 674 (5th Cir. 1974)
 
 
 [2]
 The court in Smith v. Paris, 257 F.Supp. 901 (M.D.Ala.1966) made an express finding of racial motivation before invalidating an at-large scheme on the basis of Gomillion
 
 
 [3]
 The majority in Davis cited Wright v. Rockefeller, 376 U.S. 52, 84 S.Ct. 603, 11 L.Ed.2d 512 (1964), the direct descendant of Gomillion, for the proposition that proof of a racial purpose is necessary to establish a Fourteenth Amendment violation. In his concurring opinion, Mr. Justice Stevens agreed with the majority's statement of a general rule requiring proof of discriminatory intent but noted that in cases such as Gomillion where the disproportionate impact is so dramatic, "it really does not matter whether the standard is phrased in terms of purpose or effect." --- U.S. at ----, 96 S.Ct. at 2054
 
 
 [4]
 This court's decision in Zimmer was affirmed by the Supreme Court, "but without approval of the constitutional views expressed by the Court of Appeals." East Carroll Parish School Board v. Marshall, --- U.S. ----, ----, 96 S.Ct. 1083, 1085, 47 L.Ed.2d 296, 299 (1976). The Zimmer standards, however, are still controlling in this circuit. McGill v. Gadsden County Commission, 535 F.2d 277 (5th Cir. 1976); Nevett v. Sides, 533 F.2d 1361 (5th Cir. 1976)
 
 
 [5]
 As the district court recognized, officials elected under a law subsequently declared invalid remain de facto in office until new elections can be held and successors chosen. Likewise, the city officials elected in 1975 under the court plan will continue in office as directed unless and until a new plan is ordered
 
 
 [6]
 In light of Judge Ainsworth's special concurrence, the majority deems it appropriate to expressly disavow any intention of adding to or detracting from the precedents referred to above. The decision as to whether their application to the facts presented by this case should produce a single member district or an at-large election requirement for any of the officers involved is committed to the district court in the first instance. That court should not assume that this opinion has the slightest intent to tilt its judgment in either direction
 
 
 [1]
 Affirmed ". . . but without approval of the constitutional views expressed by the Court of Appeals." East Carroll School Board v. Marshall, --- U.S. ----, 96 S.Ct. 1083, 47 L.Ed.2d 296 (1976)
 
 
 [2]
 In Connor, applicants had submitted to the district court proposed plans containing single-member districts exclusively. The court, concluding that it did not have time to fashion single-member districts because of an upcoming election deadline, issued its own plan, containing both single-member and multimember districts. Id., 402 U.S. at 690-91, 91 S.Ct. 1761. The Supreme Court stayed the order, noting that applicants had been able to devise their single-member plans within a matter of days, that census data was available, and that the district court had concluded that single-member districting would be "ideal." Therefore, the Supreme Court stated that on the record before it, the district court did have time to devise a single-member plan. Id., 402 U.S. at 692, 91 S.Ct. at 1762
 
 
 [3]
 See Zimmer, supra, 485 F.2d at 1305. We said in Gadsden County that those standards, which are set forth in the majority's opinion herein, are still controlling in this circuit. Gadsden County, supra, 535 F.2d at 280 n. 6