**Peggy H. CONNOR et al., Plaintiffs,**

v.

**Cliff FINCH et al., Defendants,**

and

**United States of America, Plaintiff-Intervenor.**

**Civ. A. No. 3830(A).**

United States District Court, S. D. Mississippi, Jackson Division.

Nov. 12, 1976.

Probable Jurisdiction Noted Jan. 17, 1977.

See 97 S.Ct. 782.

Frank R. Parker and John L. Maxey, II, Jackson, Miss., for plaintiffs.

Robert E. Hauberg, U. S. Atty., Jackson, Miss., Gerald W. Jones and Michael D. Johnson, U. S. Dept. of Justice, Washington, D. C., for the United States.

A. F. Summer, Atty. Gen., of Mississippi, William A. Allain and Giles W. Bryant, Asst. Attys. Gen., Jackson, Miss., for the defendants.

Before COLEMAN, Circuit Judge, and RUSSELL and COX, District Judges.

PER CURIAM:

This is the third, and the last, of a series of decrees reapportioning the Mississippi Legislature.[1]

The first decree reapportioned the State Senate from multiple member to single member districts, August 24, 1976, 419 F.Supp. 1072 (S.D.Miss., 1976).

The second decree reapportioned the House of Representatives from multiple member to single member districts, September 8, 1976, 419 F.Supp. 1089 (S.D.Miss., 1976).

■ The private plaintiffs and the Department of Justice have filed objections. To improve upon discrepancies involving contiguity and population, the reapportionment of the House of Representatives is hereby amended in the following respects, and to that extent only:

| District | Geographical Description | Population | Variance |
|---|---|---|---|
| 8 | Coahoma County: The Precincts of Coahoma, Lula, Lyon, and Jonestown; Tunica County: Beats 1, 2, 3 and 4; also Armory Precinct | 16,813 | -7.5 |
| 15 | Coahoma County: Beat 2 and all Clarksdale Precincts in Beats 1 and 3 | 16,677 | -8.2 |
| 16 | Coahoma County: Beat 4, Beat 5, and Mattson Precinct | 17,465 | -3.9 |
| 53 | Warren County: The Precincts of Yokena, Redbone, Goodrow, Tingle, Beechwood, Culkin, Kings, St. Aloyisuis, and American Legion (Blackburn) | 16,928 | -6.8 |
| 54 | Warren County: The Precincts of Jett, Fire Station #7, and Jonestown | 16,492 | -9.2 |

(The reapportionment of Warren County by Beats is on appeal to the Supreme Court. Precinct structure must conform to Beat structure.)

| District | Geographical Description | Population | Variance |
|---|---|---|---|
| 55 | Warren County: The Precincts of Bovina, Oak Ridge, Redwood, Walters, Brunswick, Cedar Grove, Auditorium and Central Fire Station; Yazoo County: The Precincts of Dover, East Bentonia, West Bentonia, Phoenix, Mechanicsburg, Satartia, Fugate, Deasonville, and Valley | 17,082 | -6.0 |

1. We have heretofore described the difficulties involved in the transposition of Mississippi's system of multiple member districts into a statewide single-member system for the election of legislators. The acute difficulty arises from the absence of precinct population figures and because most of the county beats have been reapportioned since 1970. No census has been taken within the new beat boundaries. We have used estimates as nearly accurate as obtainable, compiled from known factors. The private plaintiffs and the Justice Department disagree with many of these estimates, but their disagreements are *also based on estimates*. It comes down to whether single-member reapportionment shall be allowed to founder on these population disagreements. We decline to embrace that result.

The Department of Justice argues that the use of beat lines results in dilution of black voting strength. There is no credible evidence in this record to support that theory.

| | | | |
|---|---|---|---|
| 60 | Kemper County | | |
| | Lauderdale County:<br>All Precincts in<br>Beats 1 and 2 out-<br>side the City of<br>Meridian; the<br>Precincts of<br>Obadiah and<br>Shucktown in Beat<br>3 | 18,932 | +4.2 |
| 78 | Lauderdale County:<br>Meridian City<br>Precincts 1, 2,<br>3, 7 and 8, and<br>the County Precincts<br>of School Gap<br>and Nellieburg in<br>Beat 3 | 19,751 | +8.7 |
| 80 | Lauderdale County:<br>All Precincts in<br>Beat 3 outside the<br>City of Meridian<br>except Obadiah,<br>Shucktown, School<br>Gap and Nellieburg;<br>All Precincts in<br>Beat 4 except Meridian<br>Precinct No. 13;<br>All Precincts in<br>Beat 5 outside the<br>City of Meridian<br>except East Bonita | 19,371 | +6.6 |
| 98 | Amite County:<br>Beats 4 and 5<br><br>Pike County:<br>Beats 4 and 5 | 17,995 | -1.0 |
| 99 | Pike County:<br>Beats 1, 2 and 3 | 19,243 | +6.0² |

## SPECIAL ELECTIONS

The one remaining substantial issue in this case is whether we should require special elections in any of the newly created legislative districts. The 1975 elections were held pursuant to a temporary plan devised by this Court, from which no party appealed or sought a stay.

■ On the entire record we have already held that an attempted reapportionment enacted by the Mississippi Legislature in 1975 was not unconstitutional, *Connor v. Waller*, 396 F.Supp. 1308 (S.D., Miss.), reversed on other grounds, 421 U.S. 656, 95 S.Ct. 2003, 44 L.Ed.2d 486 (1975). The exhaustive analysis of the 1975 legislative act reported at 396 F.Supp., 1308–1341, is made a part of this opinion by reference. Suffice it to say that our 1975 court plan proceeded to tighten the legislatively enacted reapportionment. We remain of the view, then expressed, that the temporary plan comported with all pertinent Constitutional standards.

Consequently, we conclude that the only available thesis for ordering special elec-

tions in any of the newly formulated legislative districts would be where required to remedy any impermissible dilution of black voting strength in the temporary plan when compared with the permanent plan established for the 1979 elections.

The subject has its difficulties. See "Minority Challenges to At-Large Elections: The Dilution Problem", 10 Georgia Law Review 353 (1976).

The Fifth Circuit has written copiously in this field, two of its more recent decisions being *McGill v. Gadsden County Commission*, 5 Cir. 1976, 535 F.2d 277, and *Paige v. Gray*, 5 Cir. 1976, 538 F.2d 1108. These cases reviewed the jurisprudence, including such cases as *East Carroll Parish School Board v. Marshall*, 424 U.S. 636, 96 S.Ct. 1083, 47 L.Ed.2d 296 (1976).

■ From these cases it seems clear that (1) those who assert dilution of black voting strength have the burden of proving it; and (2) the significance of past discrimination in dilution cases lies in how it bears on political participation today.

In any event, the standards established in the Fifth Circuit *Zimmer* decision [*Zimmer v. McKeithen*, 485 F.2d 1297], reaffirmed in *Paige*, 538 F.2d at 1111, are:

· Where a minority can demonstrate lack of access to the process of slating candidates, the unresponsiveness of legislators to their particularized interests, a tenuous state policy underlying the preference for multi-member or at-large districting, or that the existence of past discrimination in general precludes the effective participation in the election system, a strong case is made. Such proof is enhanced by a showing of the existence of large districts, majority vote requirements, anti-single shot voting provisions and the lack of provision for at-large candidates running from particular geographical subdistricts. The fact of dilution is established upon proof of the existence of an aggregate of these factors. The Supreme Court's recent pronouncement in *White v. Regester, supra* [412 U.S. 755, 93 S.Ct.

---

**2.** The final judgment in this case, to be set forth on a separate document, Rule 58, Federal Rules of Civil Procedure, will reflect the changes hereinabove set forth.

2332, 37 L.Ed. 314], demonstrates, however, that all these factors need not be proved in order to obtain relief.
485 F.2d at 1305.

■ We think the Eighth Circuit correctly defined the principle when it said,

The constitutional touchstone is whether the system is open to full minority participation, not whether proportional representation is in fact achieved.
*Dove v. Moore,* 8 Cir. 1976, 539 F.2d 1152, 1155.

The electoral process in Mississippi has never known the practice generally described as "slating candidates".

The failure of the plaintiffs to demonstrate any present impact from past discrimination is described at 396 F.Supp. 1325.

Our prior opinion, 396 F.Supp. 1308, 1325, demonstrated the failure of the plaintiffs to show legislative unresponsiveness to the needs of black citizens.

The long established state policy of multi-member districts was thoroughly discussed at 396 F.Supp. 1323.

The Attorney General of the United States dispatched numerous federal observers to witness the 1975 elections in Mississippi—first primary, second primary, and general election. At these elections state and local officials are nominated and elected, *from constable to governor.* We requested a detailed report from the Attorney General as to any observed interference with the right of black citizens to participate in the 1975 elections. Nothing was reported beyond some disputes as to whether an individual was registered to vote in the precinct where he was offering to vote, whether he was registered at all, and such like. We observe that the Department of Justice has initiated no prosecutions for alleged violations of federally guaranteed voting rights in 1975.

Observers were dispatched to Mississippi to observe the 1976 Presidential and Congressional elections. The Attorney General has notified this Court of no interference with the right to vote in 1976. On the other hand, the press has uniformly reported that an unusually heavy turn-out of black voters produced the Presidential victory in Mississippi.

■ We have no difficulty in holding that at the present day interference with the right of black citizens to cast their ballots is a myth. We reaffirm our prior holding, 396 F.Supp. 1326, "that the Voting Rights Act of 1965 has effectually reduced all such racially discriminatory factors to what honestly may be termed an irreducible minimum".

### The Senate

■ There is no justification for ordering special elections in any newly created senatorial district. Every such district with a black population majority was part of a black majority district in 1975. The only difference is that there no longer will be any multiple member districts.

### The House of Representatives

Under our 1975 temporary plan there were 49 single member House districts and 7 single member flotorial districts. Twenty multiple member districts elected two representatives each, three elected three members each, and three elected four members each. Our 1979 plan has no multiple member districts.

We now discuss the newly created black majority districts, brought into existence where no black majority district previously existed.

### New District 52. Noxubee County and the Precincts of Crawford and Artesia in Lowndes County.

■ From 1890 until 1962, under the inelastic provisions of the Constitution of 1890, Noxubee County had three Representatives in the Legislature. It now has 14,288 people, less than enough for one Representative. The black population is 9,397. The white population is 4,844. Under the temporary 1975 plan Noxubee County was combined with Oktibbeha County in District 23A for the election of two Representatives.

It was also included in District 23B for the election of a flotorial Representative. The white population of District 23A is 23,413; the black population is 19,401. The 9,397 black citizens of Noxubee County, in a county with not enough population of its own to elect one Representative, took part in the election of three Representatives, two of them coming from a district which was 55% white and 45% black. A special election in new District 52 would necessitate special elections in new Districts 43, 44, 45, and 46, of which Noxubee County is not a part.

For all these reasons, no special election will be ordered for new District 52.

### New District 79. Lauderdale County: Meridian City Precincts 5, 6, 9, 13, 14, 15, 16, 17, and 18, and the Precinct of East Bonita.

■ This newly formed district was in 1975 District No. 79, which had a white population of 65.5%. The black population of the new district is 56.1%.

A special election in this District will be ordered.

### New District 81. The Counties of Claiborne and Jefferson.

Claiborne County has 10,086 people, of whom 7,522 are black, 2,536 are white.

Jefferson County has 9,225 people, of whom 6,996 are black and 2,296 are white.

It will be observed that neither county has enough people to elect a Representative.

Under the 1975 plan, Jefferson County was included in District 32 with Copiah County, a black majority county.

Claiborne County was included with Warren County in District 30 for the election of three Representatives. Warren County has 18,355 black population and 26,474 white. The totals for District 30 (Claiborne and Warren) were 29,410 white and 25,877 black (53% white, 47% black).

An added problem is that a special election in new District 81 would necessitate special elections in new Districts 53, 54, and 55 (Warren County). The redistricting of beats in Warren County (which necessarily entails the reconstitution of voting precincts) is now on appeal to the Supreme Court. Until the Supreme Court shall have decided that matter, we do not consider that equity requires that we should risk illegal elections in the three Warren County districts.

For all of these reasons, no special election will be ordered in new District 81.

### New District 3. Beats 1, 2, 3, and 4 of Marshall County.

■ In 1975 this area was in District 3A for the election of Representatives. That district included all five beats in Marshall County, instead of four beats as now reconstituted. Marshall County also participated in the election of a floater representative, District 3B. Marshall County has a population of 14,891 black people and 9,101 whites. At the general election of November 4, 1975, a white candidate for representative in District 3A received 5,573 votes. His black opponent received 3,317, carrying ten of the fifty precincts. It would appear that the black people of Marshall County have spoken and we know of no constitutional or equitable principle which would require us to undo the action they have taken.

### New District 97. Wilkinson County: Amite County; Beats 1, 2 and 3.

Wilkinson County has a population of 11,099, approximately 61% of the amount required for a representative. It has 7,499 blacks and 3,588 whites. Under the 1975 plan it was in District 34, which had a 54.2% white majority. New District 97, in which Wilkinson is now included has a total black population of 60.6%

A special election will be ordered in this District.

### Other Districts

■ The remaining new districts with black population majorities participated in the 1975 elections in districts which had

black population majorities at that time. Therefore, special elections will not be ordered in those areas.

Plaintiffs have argued that we should order special elections in all new districts in which two presently sitting Representatives have been thrown together, as well as in the areas which they say are now "left without representation". This argument overlooks the fact that what we have done is to devise a permanent plan for the election of legislators in 1979, not a plan for the wholesale reconstitution of the Legislature in mid-term. The legislators in these areas were elected to represent them for a full four years unless special elections were necessary. There is nothing of record to indicate that such legislators will now neglect the areas from which they were duly chosen.

Except as hereinabove set forth, all objections and motions for special elections filed by the private plaintiffs and the Department of Justice are found to be without merit and are denied.

### The Timing of Special Elections

■ In fixing a time for special elections, the Court is faced with a dilemma. On October 8, 1976 the Court held an afternoon's conference with the parties to determine if an agreed decree might be entered as to the identity of the districts in which special elections were to be held. The purpose was to avoid the possibility of sending persons to the Legislature in an election which the Supreme Court might later render illegal by disapproving our plan of reapportionment, also possibly unseating legislators lawfully elected in 1975. The effort was nonproductive.

It was suggested that a few new districts might be allowed to elect added members of the House of Representatives, to serve only until the 1979 elections. This would mean that if the plan should fail to pass the scrutiny of the Supreme Court then only those seats would be vacated and the legislative process would not be unduly disrupted. This was suggested particularly with reference to the districts hereinabove discussed in detail. The Supreme Court has held that it would not disapprove minor variations from a state's prescribed legislative numbers when such a change is shown to be necessary to meet constitutional requirements, *Minnesota State Senate v. Beens,* 406 U.S. 187, 199, 92 S.Ct. 1477, 32 L.Ed.2d 1 (1972). The private plaintiffs objected on the ground that this would dilute the legislative voting strength of the presently sitting four black members of the House of Representatives. Consequently, we abandoned that approach.

We have concluded that the equitable and least disruptive course would be for the Court to refrain from setting dates for special legislative elections until time for an appeal has expired or until the Supreme Court shall have decided an appeal on the merits. We expressly retain jurisdiction of the case for the purpose of setting dates for special elections as soon as one of the above alternatives shall have occurred.

### Court Costs, Special Masters' Fees, and Attorneys' Fees

■ All appropriate and legal costs of court are adjudged against the defendants, for which judgment, when the amount is computed, will be entered against the State of Mississippi, *Fitzpatrick v. Bitzer,* 427 U.S. 445, 96 S.Ct. 2666, 49 L.Ed.2d 614 (1976).

■ The Court has heretofore found that the Mississippi Legislature made a good faith effort to reapportion itself in 1973 and 1975. The 1975 effort was upheld by this Court but failed on account of the disapproval of the Attorney General of the United States. We are thus of the opinion that no attorneys' fees are allowable in this case.

The amount of the fees to be allowed the special masters for their services, for which judgment will be awarded against the State, will be determined after an evidentiary hearing on the reasonableness of such fees, for which jurisdiction is also retained.

The private plaintiffs and the Department of Justice will prepare and submit a

proposed judgment, written on a separate document, in accordance with the Rules, embodying each and every appropriate part of the decrees rendered on August 24, 1976, September 8, 1976, and on this date. When such judgment shall have been duly approved and entered the same will be a final judgment on the reapportionment of the Mississippi Legislature.