## GREATER HOUSTON CIVIC COUNSEL et al.

### v.

### Frank MANN et al.

### Civ. A. No. 73-H-1650.

United States District Court,
S. D. Texas,
Houston Division.

March 8, 1977.

L. A. Greene, Jr., Houston, Tex., George J. Korbel, San Antonio, Tex., Frumencio Reyes, Craig Washington, Houston, Tex., Jesse Roy Botello, San Antonio, Tex., for plaintiffs.

Otis H. King, City Atty. and John R. Whittington, Jr., Asst. City Atty., Houston, Tex., for defendants.

## MEMORANDUM AND OPINION

HANNAY, Senior District Judge.

This is a class action suit in behalf of black and Mexican-American minorities in Houston, Texas against members of Houston's City Council. The suit seeks to enjoin on federal constitutional grounds further elections for positions on the Council under the present system of voting. Under attack here is the city wide multidistrict voting that obtains for all councilmen, as it does for the mayor, in Houston's mayor-councilmen form of municipal government. Under Houston's Charter, and in practical operation, the mayor has pronounced and perhaps preponderant political authority. The mayor exercises unfettered administrative control over all departments of the City, has the power to appoint subject to confirmation by the Council all department heads in the City government, and has the unfettered power to remove them from office without reference to the City Council. All the administrative work of the city government is directly under his control and the Council is charged by the Charter to "deal with that part of the administrative service for which the Mayor is responsible solely through the Mayor, and neither the Council nor any member thereof shall give orders to any of the subordinates of the Mayor in said departments, either publicly or privately." General legislative power is vested in the Council with the Mayor sitting as a member thereof; councilmen are expressly prohibited from exercising any administrative power or serving as a department head. The Mayor has effective administrative control and is in full time service as Mayor while councilmanic positions contemplate part time service by the councilmen. The Mayor likewise sits on the City Council.

There are eight councilmanic positions as such in Houston city government. Five of

these positions (which have a residency requirement) represent five distinct geographical districts with the electing vote for each of these five districts being city wide and by majority vote. The three additional councilmanic positions are at-large and they are, of course, likewise elected by a city wide vote and by majority vote. This suit is brought in behalf of black and Mexican-American racial minorities in Houston that constitute, respectively, some 26% and 13% of the population thereof. Plaintiffs' contention here is that this multidistrict representation in Houston's city government serves to dilute, minimize, and cancel out said minorities' voting strength in Houston in violation of their federal constitutional rights . . . under the privileges and immunities, due process and equal protection clauses of the Fourteenth Amendment and under the Fifteenth Amendment to the Constitution of the United States.

## I.

In *Zimmer v. McKeithen*, 5 Cir., 485 F.2d 1297, at 1305, affirmed sub. nom., *East Carrol Parish School Board v. Marshall*, 424 U.S. 636, 96 S.Ct. 1083, 47 L.Ed.2d 296, the Court set out the criteria for determining impermissible voter dilution:

" . . . Clearly, it is not enough to prove a mere disparity between the number of minority residents and the number of minority representatives. Where it is apparent that a minority is afforded the opportunity to participate in the slating of candidates to represent its area, that the representatives slated and elected provide representation responsive to minority's needs, and that the use of a multi-member districting scheme is rooted in a strong state policy divorced from the maintenance of racial discrimination, . . . would require a holding of no dilution. (Dilution would exist, however) where the state policy favoring multi-member or at-large districting schemes is rooted in racial discrimination. Conversely, where a minority can demonstrate a lack of access to the process of slating candidates, the unresponsiveness

of legislators to their particularized interests, a tenuous state policy underlying the preference for multi-member or at-large districting, or that the existence of past discrimination in general precludes the effective participation in the election system, a strong case is made. Such proof is enhanced by a showing of the existence of large districts, majority vote requirements, anti single shot voting provisions and the lack of provision for at-large candidates running from particular geographical subdistricts. The fact of dilution is established upon proof of the existence of an aggregate of these factors." Accord: *Paige v. Gray*, 5 Cir., 538 F.2d 1108, 1110; *McGill v. Gadsden County Commission*, 5 Cir., 535 F.2d 277; *Nevett v. Sides*, 5 Cir., 533 F.2d 1361.

Recognizing that the phenomena is deeply rooted and widespread in American political life, the Supreme Court of the United States has expounded and established the rule that multidistrict representation is not per se unconstitutional. *Whitcomb v. Chavis*, 403 U.S. 124, 91 S.Ct. 1858, 29 L.Ed.2d 363; *Burns v. Richardson*, 384 U.S. 73, 86 S.Ct. 1286, 16 L.Ed.2d 376; *Fortson v. Dorsey*, 379 U.S. 433, 85 S.Ct. 498, 13 L.Ed.2d 401; *Lucas v. Colorado General Assembly*, 377 U.S. 713, 84 S.Ct. 1459, 12 L.Ed.2d 632; *Reynolds v. Sims*, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506. The burden of proof is clearly upon the proponent of disestablishment. *Whitcomb v. Chavis*, supra; *White v. Regester*, 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314.

*White v. Regester*, 412 U.S. 755, at 765–766, 93 S.Ct. 2332, at 2339, would require a showing that the multidistrict councilmanic system in Houston is:

" . . . being used invidiously to cancel out or minimize the voting strength of racial groups . . . To sustain such claims, it is not enough that the racial group allegedly discriminated against has not had legislative seats in proportion to its voting potential. The plaintiff's burden is to produce evidence to support findings that the political processes leading to nomination and election were not

equally open to participation by the group in question—that its members had less opportunity than did other residents in the district to participate in the political processes and to elect legislators of their choice."

See also: *Paige v. Gray,* 5 Cir., 538 F.2d 1108; *Bradas v. Rapides Parish Police Jury,* 5 Cir., 508 F.2d 1109; *Turner v. McKeithen,* 5 Cir., 490 F.2d 191; and *Reese v. Dallas County, Alabama,* 5 Cir., 505 F.2d 879.

■ Access to the political process rather than minority population-representation ratios is the keystone for determining dilution of minority voting strength. *Reese v. Dallas County, Alabama,* supra.

■ In *Wilson v. Vahue,* N.D.Tex., 403 F.Supp. 58, 61, affirmed by the Court of Appeals for the Fifth Circuit at 537 F.2d 1142 with no further appellate history, the basic jurisprudence on the subject herein was stated as follows:

"The Supreme Court of the United States and the Fifth Circuit have articulated a set of legal standards by which the constitutionality of an election system is to be gauged. It is clear that multi-member districts are not per se unconstitutional. *White v. Regester,* 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973); *Whitcomb v. Chavis,* 403 U.S. 124, 91 S.Ct. 1858, 29 L.Ed.2d 363 (1971). The plaintiffs must show the court that the system has the effect of invidiously canceling out or minimizing their voting strength. To sustain their burden, plaintiffs must prove to the satisfaction of the court that the at-large system here in question prevents them from enjoying full access to the processes of nomination and election. To show only that the group in question has not had elected officials in proportion to its voting power is insufficient. *White v. Regester,* supra; *Whitcomb v. Chavis,* supra. With these guidelines as a framework, the United States Court of Appeals for the Fifth Circuit has set out factors which, when viewed collectively in light of the existing circumstances, may support a finding of dilution of a group's voting strength. The factors to consider

are (1) the opportunity for participation in the candidate selection process, (2) the responsiveness of elected officials to the particular concerns of the group, (3) the continuing effects of past discrimination on a group's ability to participate in the political process, and (4) the policy underlying the preference for multi-member or at-large voting. *Wallace v. House,* 515 F.2d 619 (5th Cir. 1975); *Bradas v. Rapides Parish Police Jury,* 508 F.2d 1109 (5th Cir. 1975); *Turner v. McKeithen,* 490 F.2d 191 (5th Cir. 1973); *Zimmer v. McKeithen,* 485 F.2d 1297 (5th Cir. 1973).

Although these dilution factors warrant primary consideration, the court must look to any structural devices that could enhance whatever dilution potential may be found. *Wallace v. House,* supra; *Bradas v. Rapides Parish Police Jury,* supra; *Turner v. McKeithen,* supra.

This court must examine the evidence presented by plaintiffs and determine whether they have been denied meaningful participation in the City Commission elections in Amarillo in light of the four basic dilution factors, together with any enhancement factors. Every factor need not be proved in order to obtain relief; rather they should be viewed in the aggregate. *Wallace v. House,* supra."

## II.

■ The City Charter of Houston as it governs the day to day operation of municipal government is mainly the creature of a 1955 amendment which was achieved by popular vote. The central aim and purpose of this 1955 amendment was to secure adequate authority in the office of the mayor. This aim and purpose has been fully realized; and it is operating today to the distinct advantage, not the disadvantage, of the minorities here in question. I find and hold that the 1955 amendment was secured without reference to the racial question, that it is a manifestation of a salutary public policy separate and apart from the racial issue, and that its operation today is above the reproach of racial discrimination—systematic or otherwise.

Prior to the 1955 amendment single district representation obtained for city councilmen. The record shows that the minorities strongly supported that amendment which brought about the present at-large multidistrict system.

Former Mayor Louie Welch, speaking from long experience in Houston municipal government, testified that there was a high incidence of logrolling in Council under the prior single district system. This is a patent danger in a single district system. All the more dangerous would it be in an atmosphere charged with racial feeling and polarization.

"Logrolling" is defined in Webster's New International Dictionary (Second Edition, Unabridged) as: "A combining to assist another in consideration of assistance in return, especially among politicians for the accomplishment of political ends;—used opprobriously."

It must be borne in mind that the minorities in question have, jointly and/or severally, a substantial bloc vote city wide in any political contest of that dimension. It is capable of being a swing vote of potent proportions in any such contest. It must equally be borne in mind that to disestablish the present order in favor of single district representation would necessarily strip the minorities of a goodly measure of their current city wide political potency. This would be exchanged for a few certain portfolios on the City Council. There could be no guarantee in that event that a deep polarization would not develop within the newly constituted City Council on racial grounds. Undue racial militancy would almost certainly produce this result. To judicially disestablish the prevailing order merely because it might be politically improved on a subjective basis could be gravely self-defeating. See: *Turner v. McKeithen*, 5 Cir., 490 F.2d 191, at 197 and fn. 24.

Today one black sits on the City Council. A black occupies the office of City Attorney—the highest paid appointive office in City government in Houston. The City Controller is a Mexican-American. Considerable discretion and authority in municipal fiscal matters inheres in this position. He is elected by a city wide at large vote. Each of these men is highly competent and has behind him strong electoral or appointive support. The political consideration extended to minority rank and file attests to their potency in Houston City government and to the fairness with which the minorities in question are being treated in that context. There was in this case uncontradicted testimony that the most recent police academy class contained approximately 50% minority persons. A black female sits by appointment as the city's Director of Civil Service Department. As mentioned, a black sits with strength and effectiveness on the Houston City Council today.

Thus it is that both generally and in the case *sub judice* the record shows Houston to have been and to be highly responsive to the winds of change. No doubt its favorable economic climate is of significant benefit to the minorities; but basically there has been and is a forward looking posture in the area of municipal government in Houston.

Plaintiffs cite *White v. Regester*, supra, and *Lipscomb v. Wise*, 399 F.Supp. 782 for the proposition that there is improper dilution of minority voter strength because of multidistrict representation.

The lower court in *White v. Regester* found multidistrict at large state legislative representation to be improper in San Antonio, vis-a-vis the Mexican-American population, and in Dallas vis-a-vis the black population. I find and hold that the Mexican-American situation in Houston bears no resemblance—historically or otherwise—to the Barrio section in San Antonio; and that the constitutionally infirm situation of blacks in Dallas is not paralleled by the black situation in Houston. There is an added and significant distinction with *Lipscomb v. Wise* in the form of municipal government: in Dallas it is clear that the councilmen have significant administrative powers. This means that a bloc vote, constituting in itself less than a majority, might never be brought to bear in the administration of municipal government. On

the contrary, Houston's present form of municipal government maximizes the opportunity for minority participation.

The current estimate of the population of the City of Houston proper is 1,476,000. This is an increase of some threefold since 1955; and this pace of growth is expected to continue for the next decade and a half. The circumstances and conditions found to exist in Mobile, Alabama by the Court there in *Bolden v. City of Mobile*, 423 F.Supp. 384, 1976, do not obtain here. Black participation in municipal government here is clear and impressive. It is to no small extent the fruit of victory at the polls in recent mayoralty elections. But this is only added confirmation that the system in Houston does not operate to dilute impermissibly minority voter strength.

### III.

On the strength of the record and the evidence before me I find:

1. The City of Houston and the City Council have not discriminated against blacks or other minorities in the provision of City services. The City of Houston has, since 1972, undertaken every effort to hire more minority citizens as employees of the City of Houston in all levels of city employment. The Affirmative Action Program in City hiring practices has resulted in substantial increases of minority employment in all levels of City government up to and including the department head level.

The City of Houston, pursuant to policies established by the Mayor and the City Council, has purposefully devoted and continues to devote significant portions of its resources to programs and facilities serving predominantly black areas and particularized black interests. Examples of such programs are special services and social service referrals, housing quality, Fair Housing and non-discriminatory public accommodation ordinances, health care, vocational training, Police and Fire protection, recreational facilities and programs, Public Works and public transportation.

There is no evidence to support an allegation that the City Council has been unre-sponsive to the particularized needs of minority citizens of the City of Houston.

The only uncontroverted evidence of possible unresponsiveness of the City of Houston lay in the study accomplished by Ms. Rosie Cope relative to the availability of Spanish-language assistance in various departments of the City of Houston. However, even that study demonstrated that approximately 50% of Spanish-language inquiries were handled by a Spanish-speaking employee. (Testimony of Ms. Rosie Cope). Mayor Fred Hofheinz was aware of a deficiency in Spanish-language responsiveness on the part of City employees and had acted to correct that problem prior to the trial of this cause. However, there was no evidence which would indicate that this problem had been continually presented to either the Mayor's office or the City Council and ignored by those individuals.

2. Black, Mexican-American and white voters register to vote in generally the same proportion to their proportion of the population. Any person qualified to hold office as a member of the City Council of the City of Houston may have his or her name placed on the official ballot by filing with the City Secretary a petition signed by one per cent (1%) of the total number of voters voting for Mayor in the last City election or a filing fee of $500.00. Each candidate is required to state the place of his residence in the City of Houston and to designate the office for which he desires to be a candidate. There is no requirement that the candidate own property within the City of Houston.

3. The only organization which has regularly and effectively endorsed or "slated" candidates for councilmanic, mayoral and City Controller elections in the City of Houston since 1955 is the Harris County Council of Organizations. The Council is a black organization. All candidates for City Council actively seek the endorsement of the Harris County Council of Organizations.

The endorsement of a councilmanic candidate by the Harris County Council of Organizations virtually assures that candidate

of significant support in the black community. There has been no white organization comparable to the Harris County Council of Organizations operating within the City of Houston since 1955. This contrasts with the situation in *Lipscomb v. Wise*, supra, and the slating process that obtained there.

4. The citizens of Houston regularly returned incumbent councilmen to office. Since 1955, 165 candidates have run for all positions on city councils. This is a total of 88 council seats to be filled by election (8 seats in 11 elections); in 74 of the 88 instances an incumbent sought reelection to council. In all but 4 instances, incumbents (a total of 70) were successfully reelected. In the context of Houston's system, I find and hold that incumbency is the greatest obstacle to any new councilmanic candidate whatever his race. Of the 22 minority candidacies for City Council since 1955, 16 have been run against an incumbent councilman.

5. The black population of the City of Houston resides primarily in a north-south pattern in Councilmanic Districts B & D. Councilmanic District B contains approximately 80% black population while Councilmanic District D contains approximately 85% black population. The Mexican-American population of the City of Houston is widely dispersed across the City; however, there is an area of relatively dense Mexican-American population along the line running from the southern part of the Heights across the northern part of the downtown area and easterly along the Houston Ship Channel. There is no electoral precinct in which the Mexican-American population exceeds 50% of the resident voters.

I find and hold that existing minority residential patterns do not operate to deny the minorities effective representation on City Council. Nor is there today a resulting diminution of minority voting strength because of long existing residential patterns.

6. The most expensive City Council electoral campaign has resulted in an expenditure of approximately $60,000.00. The average winning campaign expenditures usually range between $20,000.00 and $35,000.00 (testimony of Mr. Jan Norris).

The cost of campaigning in a single-member district electoral scheme, where each of the eight districts would contain approximately 200,000 people, would not be significantly reduced in comparison to at-large campaign expenditures, because of the necessary reliance upon mass media to reach the voting residents of those districts. (Testimony of Mr. Jan Norris).

7. There is no evidence that the social and economic disadvantages of black and Mexican-American citizens within the City of Houston are the result of the method of electing City Council members. There was convincing evidence that the form of government itself is not directly related to the effectiveness of minority representation on City Council. There was no substantial evidence of the use of racist campaign tactics in City Council elections.

### IV.

▮ The preference for single member districts, *Connor v. Johnson,* 402 U.S. 690, 91 S.Ct. 1760, 29 L.Ed.2d 268, is not operative unless and until multimember districting in a particular case is judicially found to be constitutionally infirm. *Chapman v. Meier,* 420 U.S. 1, 18–19, 95 S.Ct. 751, 42 L.Ed.2d 766; *Paige v. Gray,* 5 Cir., 538 F.2d 1108, 1112–1116.

▮ The fair treatment which the minorities here are now receiving in context is no doubt related to success at the polls. The liberal and successful candidate for mayor is delivering on his campaign promises. This is added and ample proof that racial minority voting strength can be maximized within the system and the Charter as they now exist. Equal protection of the law in this context is a matter of right and not merely one of grace. But in the opinion of the Court, Plaintiffs' voting rights are best protected and most effectively asserted within the municipal system as it now exists.

I find and hold that the Plaintiffs have not met their burden of proof in the following respects:

1. Plaintiffs did not prove by a preponderance of the evidence that the minorities in question are denied access to the process of slating candidates or that they are unfairly denied access to the political processes of Houston civic government generally.

2. Plaintiffs did not prove by a preponderance of the evidence that the Houston City Council has been unresponsive to the needs of the minority community.

3. Plaintiffs did not prove by a preponderance of the evidence that an unacceptable or racially motivated state policy underlies the multidistrict scheme now prevailing in Houston.

4. Plaintiffs did not prove by a preponderance of the evidence a lingering present effect of past discrimination that currently limits minority participation in the voting process. Plaintiffs did not prove any debilitating effect on minority voting strength resulting from past discrimination.

5. Plaintiffs did not prove by a preponderance of the evidence that the multidistrict at-large electoral scheme in question serves to dilute or cancel out minority voting strength.

The record does not show by a preponderance of the evidence that the minorities here have difficulty in registering to vote. It does not show by a preponderance of the evidence that they are prohibited from or have difficulty in choosing the political party they desire to support or meaningfully participating in party activities. The record does not show by a preponderance of the evidence that the minorities are prohibited from qualifying as candidates for a desired office, from participating in the candidate selection process, or from participating meaningfully in any other portion of the political process.

The present method of selecting councilmen in Houston's civic government is not rooted in racial discrimination, but is based on a rational and even salutary public policy; nor is there lack of responsiveness here on the part of elected officials to the particular concerns of the minority community.

With the ultimate question here being whether there is impermissible dilution of minority voter strength, we see blacks holding a balance of power in their bloc vote, their having elected a mayor, who appears to be duly grateful to them, by the employment of that bloc vote, their having blacks in the two highest appointive positions in Houston municipal government in addition to a black on the City Council, and the only remaining elective office of city wide dimension, the Controller, being won and occupied by a Mexican-American.

In all truth and sincerity, this does not appear to be dilution of minority voter strength. Judged by results and by performance, I find and hold that minority representation on Houston's City Council is significant, important, and meaningful.

In *Wallace v. House*, 5 Cir., 515 F.2d 619, the Court of Appeals sustained a trial court finding of dilution and unconstitutionality in all at large voting for aldermanic positions in Ferriday, Louisiana—a town of some 5,200 residents. More than one half the population of that town was black and blacks had only slightly less than 50% of the registered voters in Ferriday. The record for political consideration to blacks there was not good. The situation in Ferriday, Louisiana does not bear similarity to the situation in Houston. The case of *Perry v. City of Opelousas*, 5 Cir., 515 F.2d 639 involved a situation similar to that in *Wallace v. House*, supra. But, again, this is not similar to the situation in Houston, Texas.

The result reached herein is consonant with that reached by Judge Woodward in *Wilson v. Vahue*, 403 F.Supp. 58, affirmed by the Court of Appeals for the Fifth Circuit at 537 F.2d 1042, by a representative panel consisting of Chief Judge Brown and Circuit Judges Gewin and Morgan which decision, in practical effect, agreed with the reasoning of the trial court.

■ The result reached here is also in harmony with that reached by Judge Roberts in *Hernandez v. Friedman*, C.A. No. A–76–229 (January 28, 1977) regarding the city of Austin, Texas. Here as in *Hernan-*

*dez v. Friedman*, supra, the issue is not one of *past* discrimination but "whether any debilitating effects of that discrimination *still persist.*", citing *Bradas v. Rapides Police Jury*, 5 Cir., 508 F.2d 1109, at 1112. The answer here is that there are not present debilitating effects of past discrimination.

 Plaintiffs argue that the fact findings in *Lipscomb v. Wise*, supra and in *Graves v. Barnes*, 343 F.Supp. 704, affirmed sub nom. in *White v. Regester*, supra, render those cases controlling of the issue here. But it is axiomatic that in this area each case is determined on its own merits and on the facts as they exist therein.

"As the Supreme Court's opinions make clear, the constitutionality of multimember districting is an empirical matter, to be decided on the facts of a particular case." *Paige v. Gray*, 5 Cir., 538 F.2d 1108, at 1112.

For the reasons stated above, the Petition for injunction and for declaratory relief is in all respects denied.

Any Finding of Fact hereinabove made which also constitutes a Conclusion of Law is hereby adopted as a Conclusion of Law. Any Conclusion of Law herein made which also constitutes a Finding of Fact is hereby adopted as a Finding of Fact.