**William DOVE, Sr., et al., Appellants,**

v.

**Charles E. MOORE et al., Appellees.**

**No. 75–1918.**

United States Court of Appeals,
Eighth Circuit.

Submitted May 13, 1976.

Decided July 27, 1976.

---

Charles E. Williams, III, New York City, George Howard, Jr., Pine Bluff, Ark., for appellants; Jack Greenberg, New York City, on brief.

John A. Davis, Bridges, Young, Matthews & Davis, Michael R. Dennis, City Atty., Pine Bluff, Ark., for appellees.

Before BRIGHT and WEBSTER, Circuit Judges, and TALBOT SMITH, Senior District Judge.*

BRIGHT, Circuit Judge.

In this class action brought by four black residents of Pine Bluff, Arkansas, on behalf of all black voters of that city, William Dove, Sr. and other plaintiffs-appellants attack Pine Bluff's system of electing all eight members of the city council at-large rather than from single-member wards. Plaintiffs-appellants allege that the at-large system operates to discriminate against blacks by diluting their voting power, and, thus, precluding blacks from achieving representation on the city council in proportion to their race. We reject the contentions of the plaintiffs-appellants and affirm the judgment of the district court which determined that Pine Bluff's at-large system meets constitutional standards.

This case has a convoluted history.[1] The facts are detailed in the reported decisions cited in note 1 *supra*, and need not be set out at length here. Briefly, they may be stated as follows.

* TALBOT SMITH, Senior District Judge, Eastern District of Michigan, sitting by designation.

1. The litigation was initially filed in December of 1968. It purported to attack an Arkansas statute of statewide application requiring cities of the size of Pine Bluff to utilize an at-large

Pine Bluff's population of approximately 58,000 is 40 percent black and 60 percent white. A council composed of eight aldermen governs the city. Two aldermen are required to reside in each of the four wards into which the city is divided.[2] However, the elections for each position are held at-large. Every eligible city resident may vote on the candidates for each position and a majority is required for election. Prior to the election a primary is held in the same manner. In both the primary and the general election, if no candidate for a position receives a majority a runoff is held between the two candidates with the greatest number of votes.

There are several "political realities" in Pine Bluff which must be recognized. First, Pine Bluff has a single-party political structure. Success in the Democratic primary is tantamount to election. No Independent or Republican candidate for the office of alderman has been successful for at least the last 50 years. Second, the voters of Pine Bluff have a strong affinity for incumbents. The only time within living memory that an incumbent alderman seeking re-election was defeated occurred in 1936. The record shows that prior to the initiation of this lawsuit in 1968, black candidates ran for the office of alderman on six occasions. All were defeated. However, all of these black candidates ran against incumbent Democratic opponents and on three occasions they ran as Republicans or Independents rather than competing in the Democratic primary.

In 1970, an alderman resigned. To fill this vacancy, the remaining aldermen appointed Mr. Chester Hynes, a black. Shortly thereafter, this appointed term expired. Mr. Hynes ran unopposed and was re-elected. In the 1974 election, Alderman Hynes faced white opposition. The voters adhered to Pine Bluff's "re-election" tradition and elected incumbent Hynes. He received substantial and crucial votes from white voters. For example, in Ward 3, which is 99.6 percent white and contains approximately 40 percent of the entire white population of Pine Bluff, he received 44.5 percent of the vote.

The record contains other evidence of the role of the black residents in city politics.

election system. Plaintiffs' request for the convening of a three-judge court was denied, apparently because plaintiffs specified the wrong state statute as the object of their attack. After two years of discovery, during the first day of trial before a single judge, this mistake was discovered. The complaint was amended to challenge the proper statute and plaintiffs again requested the convening of a three-judge district court. That request was granted. After further proceedings, on September 17, 1973, the three-judge district court entered its opinion and judgment dismissing the complaint and approving the at-large election system. *Dove v. Bumpers*, 364 F.Supp. 407 (E.D.Ark.1973).

Plaintiffs appealed the judgment of the three-judge court, not to the Supreme Court, but to this circuit. Plaintiffs asserted on appeal that it was error to have granted their request for a three-judge court since the state statute, although couched in general terms, in fact applied only to two cities within the state. A panel of this court agreed that a three-judge district court should not have been convened. The panel noted that since entry of judgment in the district court, the state statute had been amended to permit, although not require, single-member city council districts in cities of the size of Pine Bluff. The panel indicated that it was "not willing to assume that a single judge sitting alone, though formerly a member of the three-judge panel, would adopt the original opinion of the panel." *Dove v. Bumpers*, 497 F.2d 895, 897 (8th Cir. 1974). The panel therefore remanded the case for further consideration by the district court.

On remand in the district court, the state defendants were dismissed and the complaint was amended to focus upon the city council's decision not to opt for a single-member district system.

After further proceedings, United States District Judge Oren Harris again entered judgment approving Pine Bluff's election system. His unreported opinion and order are essentially consistent with the prior opinion of the three-judge panel which Judge Harris also had authored. It is from his latest judgment that the present appeal is taken.

2. The wards vary substantially in population. However, at oral argument counsel for plaintiffs expressly informed the court that these population disparities were not being challenged in this action and that if the at-large system were retained equalization of the ward populations would confer no significant benefit on the plaintiff class. Black residents form a majority of both the largest and smallest of the four wards.

Austin Franks, a white man who served Pine Bluff as mayor from 1964 until early 1975, testified that on his first election approximately 60 percent of the blacks voted for him. When re-elected in 1968, he received approximately 70 percent, and in 1972, 85–90 percent. In his opinion, the support of black voters was absolutely essential to his re-election.

Mayor Franks' resignation in April of 1975 necessitated a special election. Four white candidates and one black candidate sought to succeed Mr. Franks as mayor. All of the white candidates campaigned actively in black areas. One of the white candidates received substantial black support, including the active participation of local black leaders in his campaign. In a group of precincts identified as being from 90 percent to 100 percent black, the white candidates received 25 percent of the vote, and in one such precinct their support was as high as 44 percent. Yet, despite this "diversion" of black votes, the black candidate, Rev. Robert Hanley, received the second highest number of votes cast and thus was in the runoff election, which he lost.

The Pine Bluff primary allows "crossover" voting. Any registered voter may vote in the Democratic primary and need not decide to do so until after entering the voting booth. Any individual is permitted to run in the Democratic primary. There is no central group or committee whose endorsement, as a practical matter, controls the outcome of the Democratic primary. Blacks can and do hold office in the Pine Bluff Democratic Party; three are members of the local Democratic Central Committee.

At oral argument counsel for plaintiffs conceded that "the electorate of Pine Bluff is the group which controls the democratic process * * *." However, he argued that because of the tendency of Pine Bluff voters, white and black, to vote for candidates of their own race, the at-large primary unconstitutionally discriminates in favor of the white majority and against the black minority. He argued that because of the winner-take-all aspect of the primary and general election, the white majority occupies a position similar to the white-dominated Dallas Committee for Responsible Government which the Supreme Court found to have manipulated illegally a multi-member legislative district in *White v. Regester*, 412 U.S. 755, 766–67, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973).

It is true that at-large elections or multi-member districts have certain objectionable features which lead the federal courts strongly to prefer single-member districting. *East Carroll Parish School Board v. Marshall*, 424 U.S. 636, 96 S.Ct. 1083, 47 L.Ed.2d 296 (1976) (*per curiam*).[3] Never-

---

**3.** The author has previously discussed at length the undesirable characteristics of at-large elections and the benefits of single-member districts. *Chapman v. Meier*, 372 F.Supp. 371, 388–94 (D.N.D.1974) (three-judge court) (Bright, J., dissenting), *majority reversed*, 420 U.S. 1, 95 S.Ct. 751, 42 L.Ed.2d 766 (1975). In the context of a discussion of proposed plans for the reapportionment of a state legislature, the dissent emphasized the following benefits of single-member districts:

(1) It gives a voter a chance to compare only two candidates, head to head in making a choice.

(2) It prevents one political party with a heavy plurality in one or two potential districts from dominating other potential districts that might narrowly go for the candidate of the opposite party.

(3) It prevents a city wide political organization from ostracizing or disciplining a legislator, who dares stray from the machine's line.

(4) It permits a citizen to identify a legislator as his senator and makes direct communication easier.

(5) It makes each senator responsible for his actions and makes it difficult for a senator to fade into the ranks of "the team" to avoid being identified with specific actions taken.

(6) It reduces campaign costs and "personalizes" a campaign.

(7) It creates greater interest in the possibility of a citizen seeking a legislative seat without the political machine blessing.

(8) It would diminish the animosity created in the legislature against multi-senate districts because of the tendency of senators elected by one political party from a city to vote as a bloc.

theless, the Supreme Court has made it clear that these objectionable features do not render an at-large system unconstitutional *per se*. *White v. Regester, supra; Whitcomb v. Chavis, supra*. The constitutional touchstone is whether the system is open to full minority participation, not whether proportional representation is in fact achieved. In *White v. Regester*, relying primarily upon *Whitcomb v. Chavis*, the Supreme Court set out the law governing a claim that a multi-member district is racially discriminatory as follows:

> t is not enough that the racial group allegedly discriminated against has not had legislative seats in proportion to its voting potential. The plaintiffs' burden is to produce evidence to support findings that the political processes leading to nomination and election were not equally open to participation by the group in question—that its members had less opportunity than did other residents in the district to participate in the political processes and to elect legislators of their choice. [412 U.S. at 766, 93 S.Ct. at 2339.]

The district court determined that appellants here have not met this burden.

(9) It would tend to guarantee an individual point of view if all senators are not elected as a team.
(10) It would equalize the power of people in single senate districts with the people in the broken down multi-senate districts to *influence* the *election* of *only one* senator. [372 F.Supp. at 391 (footnote omitted) (emphasis in original).]
Obviously, the severity of the problems generated by at-large or multi-member districts varies with the size of the district and the purpose of the election. Since all eligible city voters may vote for all members of the city council, there is no disparity between their voting power and that of voters in single-member districts. *Cf. Whitcomb v. Chavis*, 403 U.S. 124, 144–48, 91 S.Ct. 1858, 29 L.Ed.2d 363 (1971). Nor is there any indication that the ballots in the city council elections were unduly long, cumbersome, or confusing. *Cf. Lucas v. Forty-Fourth General Assembly*, 377 U.S. 713, 731, 84 S.Ct. 1459, 12 L.Ed.2d 632 (1964).

4. Plaintiffs-appellants originally claimed substantial disparities between the services provided black and white residents. However, with ample support in the record the district court found that these claims were largely without merit. As previously noted, the elected officers

That determination is supported by ample evidence which indicates that the black residents of Pine Bluff have full, open, and equal access to the city's political processes. The record demonstrates that they play an active and significant political role in city politics.[4] While the at-large system is not designed to maximize the number of minority candidates elected, it serves other values[5] and is not an unconstitutional means of implementing the democratic process.

In sum, the appellants' argument rests upon the contention that the at-large election of city officials invidiously discriminates against blacks because blacks vote substantially only for blacks and whites in greater number vote substantially for whites. The argument continues that if the city were divided into single-member wards, blacks would probably control more than one ward and could thus elect more than one black alderman. This change to single-member districts is said to be essential to allow Pine Bluff's black voters full and equal access to the political process. The argument falls in light of the evidence that blacks and whites alike have rejected

of Pine Bluff who testified indicated that today a successful candidate must campaign for and attract voters of both races. In recent years, because of federal revenue sharing and for other reasons, Pine Bluff has experienced a significant increase in revenues. The witnesses called below are largely in agreement that a large portion of these funds have been expended on projects favored by the black community.

As a practical matter, it is not clear that single-member wards would enhance the political strength of the black voters of Pine Bluff. Because of the geographic distribution of black voters, it is likely that they would form the great majority of two or three wards, leaving five wards with few, if any, black voters. The aldermen from these five wards, a majority of the council, would have little political incentive to give consideration to black concerns. By contrast, under the present at-large system, every candidate has a 40 percent black constituency which cannot be ignored with impunity.

5. *See Chapman v. Meier, supra*, 420 U.S. at 20 n. 14, 95 S.Ct. 751; *Whitcomb v. Chavis, supra*, 403 U.S. at 157–59 & nn., 91 S.Ct. 1858; *Fortson v. Dorsey*, 379 U.S. 433, 438, 85 S.Ct. 498, 13 L.Ed.2d 401 (1965).

race as the overriding criterion in voting for candidates in the Pine Bluff city elections.

Accordingly, we affirm the judgment of the district court.