LEADERSHIP ROUNDTABLE, Irma Brown, Jeffery Hawkins, Albert Porter and Dr. W. H. Townsend

v.

CITY OF LITTLE ROCK, Carleton McMullin, A. M. Keith, Jim Dailey, Dwight Linkous, Jim Wellons, Donald Mehlburger, Mike Castleman, Myra Jones, Webster Hubbell, John Langston, Byron Morse, and Mahlon A. Martin.

No. LR–C–77–137.

United States District Court, E. D. Arkansas, W. D.

Sept. 26, 1980.

**580**

Perlesta A. Hollingsworth, Little Rock, Ark., for plaintiffs.

Philip Lyon, House, Holmes & Jewell, R. Jack Magruder, City Atty., City of Little Rock, Little Rock, Ark., for defendants.

## MEMORANDUM OPINION

EISELE, Chief Judge.

### INTRODUCTION

The plaintiff Leadership Roundtable is an organization established to secure the rights of black citizens of Pulaski County, Arkansas, and to further the political, social, and civic interests of blacks. The plaintiffs Irma Brown, Jeffery Hawkins, and Dr. W. H. Townsend are black citizens of the United States, residents of Pulaski County, and registered voters of the City of Little Rock, Arkansas.

■ The defendant City of Little Rock is a municipal corporation recognized by the laws of the State of Arkansas. The defendant Carleton E. McMullin was, at the time this case was filed in 1977 and at the time of trial, the City Manager of the City of Little Rock.[1] The defendants A. M. Keith, Jim Dailey, Dwight Linkous, Jim Wellons, Donald Mehlburger, Mike Castleman, Myra Jones, Webster Hubbell, John Langston, and Byron Morse are past and present members of the Board of Directors for the City of Little Rock.

The plaintiffs brought this action pursuant to 42 U.S.C. § 1983, seeking declaratory and injunctive relief for an alleged deprivation, under color of state law, of rights secured to them by the United States Constitution. They challenge the constitutionality of the "at–large" method of electing city directors in Little Rock on First, Thirteenth, Fourteenth, and Fifteenth Amendment grounds.[2] They allege that the at–large method of electing city directors effectively dilutes the voting power of blacks in Little Rock and excludes them from meaningful participation in the election of city directors and in the political processes and government of the city.[3] The plaintiffs ask the Court to enjoin the defendants from conducting any further at–large elections and to require the establishment of single–member districts from which city directors will be elected.

The Court has jurisdiction over this cause pursuant to 28 U.S.C. § 1343.

The case was tried to the Court on March 10, 11, 12, 21, 24, 25, and 26, 1980. For the reasons which follow, the Court dismisses the complaint and denies the relief requested.

---

1. Pursuant to Fed.R.Evid. 201, the Court takes judicial notice of the fact that, since the trial of this case, Mr. McMullin, who is white, has resigned as City Manager. The Court further notices that Mahlon A. Martin, who is black and who now serves as City Manager, was appointed by the Board of Directors for the City of Little Rock to succeed Mr. McMullin.

    Since Mr. McMullin is sued in his individual, as well as his official, capacity, he will remain a defendant in this case. Mr. Martin is hereby added as a party defendant in his official capacity as City Manager of the City of Little Rock, pursuant to Fed.R.Civ.P. 25(d).

2. Although the plaintiffs have pleaded the First and the Thirteenth Amendments in their complaint, they have not urged upon the Court any analysis independent of Fourteenth and Fifteenth Amendment analyses.

3. This case was originally filed as a class action. In a pretrial conference on September 27, 1979, the Court informed the parties that the case would proceed provisionally without class certification and that if the plaintiffs intended to pursue the case as a class action, they should file a brief in support of class certification on or before October 12, 1979. No such brief having been filed, the case is proceeding as an individual action on behalf of the named plaintiffs only.

## DEVELOPMENT OF THE LAW

A preliminary discussion of the development of relevant case law identifies the factors which should be considered in assessing the evidence in this case. In *Reynolds v. Sims*, 377 U.S. 533, 556, 84 S.Ct. 1362, 1378, 12 L.Ed.2d 506 (1964), the United States Supreme Court stated:

In *Baker v. Carr*, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 [1962], we held that a claim asserted under the Equal Protection Clause challenging the constitutionality of a State's apportionment of seats in its legislature, on the ground that the right to vote of certain citizens was effectively impaired since debased and diluted, in effect presented a justiciable controversy subject to adjudication by federal courts.

The *Reynolds v. Sims* Court further noted that "the right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise." *Reynolds v. Sims, supra*, 377 U.S. at 555, 84 S.Ct. at 1378 (footnote omitted).

In *Fortson v. Dorsey*, 379 U.S. 433, 85 S.Ct. 498, 13 L.Ed.2d 401 (1965), the Court held that multi–member districts in a state legislative apportionment scheme were not *per se* unconstitutional. The Court went on to say, however:

It might well be that, designedly or otherwise, a multi–member constituency apportionment scheme, under the circumstances of a particular case, would operate to minimize or cancel out the voting strength of racial or political elements of the voting population. When this is demonstrated it will be time enough to consider whether the system still passes constitutional muster.

*Id.* at 439, 85 S.Ct. at 501.

In *Whitcomb v. Chavis*, 403 U.S. 124, 91 S.Ct. 1858, 29 L.Ed.2d 363 (1971), the Supreme Court overturned a lower court ruling that the election of state senators and representatives from the multi–member district under consideration was unconstitutional. The Court held that an identifiable, geographically concentrated group of blacks with distinctive substantive–law interests was not constitutionally entitled to proportionate representation in the state legislature. *Id.* at 148–49, 91 S.Ct. at 1871–1872. The Court noted that there was no evidence of intentional discrimination and then stated:

Nor does the fact that the number of ghetto residents who were legislators was not in proportion to ghetto population satisfactorily prove invidious discrimination absent evidence and findings that ghetto residents had less opportunity than did other Marion County residents to participate in the political processes and to elect legislators of their choice.

*Id.* at 149, 91 S.Ct. at 1872. Finding no such evidence, the Court concluded that the multi–member district in question was constitutional. *Id.*

In *White v. Regester*, 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973), for the first and only time, the Supreme Court upheld a district court determination that a multi–member district component of a state legislative apportionment scheme unconstitutionally diluted the voting strength of a discrete group. The Court stated that:

[t]he plaintiffs' burden [was] to produce evidence to support findings that the political processes leading to nomination and election were not equally open to participation by the group in question— that its members had less opportunity than did other residents in the district to participate in the political processes and to elect legislators of their choice.

*Id.* at 766, 93 S.Ct. at 2339 (citation omitted). The Court identified several relevant factors, all of which supported the plaintiffs' claims in that case. *Id.* at 766–67, 93 S.Ct. at 2339–2340. They were:

(1) the history of official race discrimination in the state, which had previously affected minority voting rights;

(2) the rule requiring a majority vote as a prerequisite to nomination in a primary election;

(3) the requirement that a candidate run for a particular position, which, when coupled with the majority vote require-

ment, created a head–to–head contest for each position;

(4) the fact that only two blacks had been elected to the legislature from the district since Reconstruction days, and that these two were the only two blacks ever slated by the allegedly controlling white–dominated committee;

(5) the fact that support by blacks was not needed to win elections;

(6) the fact that the controlling committee did not exhibit good–faith concern for the needs of the black community;

(7) successfully employed racial campaign tactics; and

(8) the conclusion that the black community was effectively excluded from the Democratic primary process and was, thereby, excluded from meaningful participation in the political process.

*Id.*

In *Washington v. Davis,* 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976), the Court held that proof of intent, purpose, or motive was necessary to make out a claim of racial discrimination under the Fifth Amendment. The Court's reasoning and language were broad enough to make it clear that the same standard would be applied in Fourteenth Amendment cases.

Disproportionate impact is not irrelevant, but it is not the sole touchstone of an invidious racial discrimination forbidden by the Constitution. Standing alone, it does not trigger the rule ... that racial classifications are to be subjected to the strictest scrutiny and are justifiable only by the weightiest of considerations.

*Id.* at 242, 96 S.Ct. at 2049. Nevertheless, all of the opinions of the justices acknowledged that intent might be inferred from disproportionate impact.

Necessarily, an invidious discriminatory purpose may often be inferred from the totality of the relevant facts, including the fact, if it is true, that the law bears more heavily on one race than another.

*Id.*

Frequently the most probative evidence of intent will be objective evidence of what actually happened rather than evidence describing the subjective state of mind of the actor. For normally the actor is presumed to have intended the natural consequences of his deeds. This is particularly true in the case of governmental action which is frequently the product of compromise, of collective decisionmaking, and of mixed motivation.

*Id.* at 253, 96 S.Ct. at 2054 (opinion of Mr. Justice Stevens).

The United States Court of Appeals for the Fifth Circuit has written more on the problem now confronting this Court than has any other court. In *Nevett v. Sides,* 571 F.2d 209 (5th Cir. 1978), the court identified the factors which it considered relevant in this type case. These factors were gleaned from the opinion in *Zimmer v. McKeithen,* 485 F.2d 1297 (5th Cir. 1973) (en banc), *aff'd sub nom. East Carroll Parish School Board v. Marshall,* 424 U.S. 636, 96 S.Ct. 1083, 47 L.Ed.2d 296 (1976) (hereinafter *"Zimmer"*), and are commonly referred to as "Zimmer criteria."

The court in *Zimmer* established two categories, one containing criteria going primarily to the issue of denial of access or dilution, the other containing inquiries as to the existence of certain structural voting devices that may enhance the underlying dilution. The "primary" factors include: [1] the group's accessibility to political processes (such as the slating of candidates), [2] the responsiveness of representatives to the "particularized interests" of the group, [3] the weight of the state policy behind at–large districting, and [4] the effect of past discrimination upon the group's participation in the election system.... The "enhancing" factors include: [1] the size of the district; [2] the portion of the vote necessary for election (majority or plurality); [3] where the positions are not contested for individually, the number of candidates for which an elector must vote; and [4] whether candidates must reside in subdistricts.

*Nevett v. Sides, supra,* 571 F.2d at 217 (citations and footnote omitted). After analyzing the impact of *Washington v. Davis, supra,* 426 U.S. 229, 96 S.Ct. 2040, the court

held that a showing of racially motivated discrimination was a necessary element in a successful voting dilution claim brought under the Fourteenth Amendment or the Fifteenth Amendment. *Nevett v. Sides, supra,* 571 F.2d at 219, 221. The court opined that the *Zimmer* criteria could provide a factual basis from which the necessary intent might be inferred. *Id.* at 223.

In *Dove v. Moore,* 539 F.2d 1152 (8th Cir. 1976), the Court of Appeals for the Eighth Circuit affirmed the district court's determination that the City of Pine Bluff's at–large system of electing city council members was constitutional. In assessing the evidence, it identified several significant factors:

> (1) "that the black residents of Pine Bluff have full, open, and equal access to the city's political processes;"

> (2) "that they play an active and significant political role in city politics;"

> (3) that although "the at–large system is not designed to maximize the number of minority candidates elected, it serves other values and is not an unconstitutional means of implementing the democratic process;" and

> (4) "that blacks and whites alike have rejected race as the overriding criterion in voting for candidates in the Pine Bluff city elections."

*Id.* at 1155–56.

*Dove v. Moore, id.,* affirmed the decision of the Honorable Oren Harris, United States District Judge for this district, which was set forth in an unreported opinion. Judge Harris had previously authored the reported opinion of a three–judge district court, which opinion was vacated by the Court of Appeals on the ground that the three–judge court was improperly convened. Judge Harris' two opinions were described by the Court of Appeals as being "essentially consistent." *Id.* at 1153, n.1. The findings upon which the three–judge district court relied in the reported opinion included findings that predominantly black areas received more than their proportionate share of funds and services from the city, that the plaintiffs failed to establish

that there was any racial motivation behind the establishment of the at–large election system, and that blacks in Pine Bluff did "have an active and viable participation in the processes of local government." *Dove v. Bumpers,* 364 F.Supp. 407, 415 (E.D.Ark. 1973), *vacated and remanded on other grounds,* 497 F.2d 895 (8th Cir. 1974).

In *Mobile v. Bolden,* 446 U.S. 55, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980) (hereinafter *"Bolden"*), the Supreme Court decided a case closely analogous, in terms of the legal issues raised, to the case *sub judice.* The district court and the court of appeals had held that the at–large method of electing the City Commission of Mobile, Alabama (that city's three–member governing board) unconstitutionally diluted the voting strength of blacks. The Supreme Court reversed.

None of the justices articulated a doctrinal or analytical approach which was fully accepted by a majority of the Court. Justice Stewart, writing for a plurality consisting of himself and three other justices, took the view that a successful voting strength dilution challenge requires proof of purposeful discrimination, whether analyzed under the Fifteenth Amendment or the Fourteenth Amendment. *Id.* at 61–62, 100 S.Ct. at 1497–1518. Justice Stewart further stated that "[a]lthough the presence of the indicia relied on in *Zimmer* may afford some evidence. of a discriminatory purpose, satisfaction of those criteria is not of itself sufficient proof of such a purpose." *Id.* at 72, 100 S.Ct. at 1503. Despite factual findings that approximately 35.4% of the Mobile population was black, that no black had ever been elected to the Mobile City Commission, that the elected Commission members discriminated against blacks in municipal employment and in dispensing public services, that Alabama had a substantial history of racial discrimination, and that the particular at–large, "runoff" system in question tended to disadvantage any voting minority, the Stewart plurality concluded that the plaintiffs had failed to prove purposeful discrimination and unconstitutional voting strength dilution. *Id.* at 58, 73, 100 S.Ct. at 1495–1503.

Justice Blackmun concurred in the judgment of the Court on the ground that the district court abused its discretion in granting the affirmative relief it ordered. He and three other justices, however, would have concluded that, assuming proof of purposeful discrimination was necessary, " 'the findings of the District Court amply support an inference of purposeful discrimination.' " *Id.* at 80, 100 S.Ct. at 1507 (quoting from the opinion of Justice White).

Justice Stevens agreed with the Stewart plurality that the *Zimmer* analysis should be rejected, thereby creating a majority for that position. *Id.* at 88, 100 S.Ct. at 1511. Otherwise, however, he took a unique approach which is reflected in the following quote from his opinion:

In my view, the proper standard is suggested by three characteristics of the gerrymander condemned in *Gomillion* [*v. Lightfoot*, 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110 (1960)]: (1) the 28–sided configuration was, in the Court's word, "uncouth," that is to say, it was manifestly not the product of a routine or a traditional political decision; (2) it had a significant adverse impact on a minority group; and (3) it was unsupported by any neutral justification and thus was either totally irrational or entirely motivated by a desire to curtail the political strength of the minority. These characteristics suggest that a proper test should focus on the objective effects of the political decision rather than the subjective motivation of the decisionmaker.

*Id.* (citation and footnote omitted). Applying the identified factors to the Mobile factual situation, he concluded that the system in question was constitutional even though it had an adverse impact on black voters. *Id.* at 88–92, 100 S.Ct. at 1511–1513.

Justice Brennan agreed with Justice White and with Justice Marshall, who dissented on different grounds. Justice White did not disagree with the plurality's conclusion that proof of purposeful discrimination was necessary, but he did disagree with the conclusion that such proof had not been produced in this case. He concluded "that the findings of the District Court amply support an inference of purposeful discrimination . . . ." *Id.* at 101, 100 S.Ct. at 1519.

Justice Marshall, in dissent, would have held that proof of discriminatory impact alone was sufficient to sustain the claim raised. *Id.* He further concluded that, even if proof of discriminatory intent were necessary, he would impose a less stringent evidentiary standard on the plaintiffs than would the plurality. *Id.*

Thus, although there is no single approach which has been adopted by a majority of the Supreme Court, several approaches have been suggested in *Bolden* and in the pre-*Bolden* cases. Applying these approaches to the facts of this case is a revealing exercise. The Court finds it unnecessary to adopt a particular approach in this case, because the Court concludes that under any of the major approaches identified, the plaintiffs have failed to prove their claim in this case.

## BACKGROUND

Arkansas and Little Rock have a long history of racial discrimination. Prior to the Civil War, blacks were precluded from voting in Arkansas. The Arkansas Constitution of 1868 first permitted blacks to vote in Arkansas. A few blacks were elected to office during the Reconstruction period, but blacks were again effectively disenfranchised in Arkansas through various means, including intimidation and legal impediments such as literacy tests and poll taxes. The poll tax was a requirement for voting in Arkansas until 1965, when it was repealed by Amendment 51, Section 17 of the Arkansas Constitution. The federal Voting Rights Act was also passed in 1965. 42 U.S.C. §§ 1973 to 1973aa–5 (1978). Since 1965, there has been no legal impediment in Arkansas to voting by blacks.

Until 1957, Little Rock was governed under the Mayor–City Council form of government, also known as the "Mayor–Alderman" form. *See generally* Ark.Stat. Ann. §§ 19–901 to 942 (1956). The Council was composed of the mayor and ten aldermen, two from each of five wards. Ark.

Stat.Ann. § 19–1002 (1956). The aldermen and the mayor were elected in partisan elections, with primaries if necessary. Ark. Stat.Ann. § 19–1003.1 (1956). In the primary, the aldermen were nominated solely by the voters residing in their ward, but the mayor ran at large. *Id.* Both the general election and the primary elections required a majority vote and, therefore, if necessary, runoff elections. (JX 33).[4]

On November 6, 1956, the citizens of Little Rock voted to adopt the City Manager form of government pursuant to Arkansas Act 99 of 1921. Ark.Stat.Ann. §§ 19–701 to 731 (1956). Little Rock's City Manager form of government was organized under the act as amended in 1957. Ark.Stat.Ann. §§ 19–701 to 733 (1967 cum. supp.); *Mann v. Lowry*, 227 Ark. 1132, 303 S.W.2d 889 (1957).

Pursuant to Ark.Stat.Ann. §§ 19–704 and 705 (1980), the members of the Little Rock Board of Directors are currently elected on an at–large basis. This election scheme has no residency requirements by wards or districts, but does have permanently designated positions numbered 1, 2, 3, 4, 5, 6, and 7. *Id.* Each candidate for Director specifies the position for which he or she is running. *Id.* Each Director is elected by the electors of the City at large. *Id.* Elections for Board membership are non–partisan, and they are determined on a plurality basis. *Id.* Directors receive no compensation for their services. *Id.* They serve for four–year terms. *Id.* To run for director, a candidate must submit a one–dollar filing fee and a petition signed by fifty registered voters. *Id.* The Mayor and Assistant Mayor are elected by the Board from among its members. Ark.Stat.Ann. § 19–708 (1980).

By Act 168 of 1973, the Arkansas legislature amended Ark.Stat.Ann. § 19–704(c) to provide that city directors be elected by a majority and to provide for a runoff election in case no candidate for a particular position received a majority of the votes cast. That amendment was held invalid.

*Mears v. Little Rock*, 256 Ark. 359, 508 S.W.2d 750 (1974). Directors are, therefore, still elected by plurality.

Act 808 of 1977 provided that the majority of the members of the governing boards of other Arkansas cities would be elected from single–member districts. Ark.Stat. Ann. § 19–902.6 (1980). Little Rock was exempted from this statute by a section which reads:

The provisions of this Act shall not be applicable to any city in the State having a manager form of government and located in a county having a population of 100,000 or more persons. Provided however, any such city may by ordinance of the governing body thereof approved by a majority of the qualified electors of such city voting on the question, choose to elect all or a part of the members of the governing body of the city from single member districts.

Ark.Stat.Ann. § 19–902.9 (1980). Little Rock is the only city presently affected by this section's exemption.

On September 5, 1978, Director Dwight Linkous proposed to the Board of Directors that it pass an ordinance providing for the election of four directors from single–member districts. (DX 13). If passed, the ordinance would have been submitted to the electorate of the city for approval or disapproval. The proposal was, however, defeated by a vote of 4 to 2. (DX 15). All Little Rock City Directors therefore continue to be elected at large.

## FINDINGS OF FACT

The Court makes the following findings of fact. Any other statement in this opinion which may be deemed a finding of fact is also adopted as such.

1. There was no racially discriminatory motive, intent, or purpose involved in the 1956 adoption of the city manager form of government for the City of Little Rock. The adoption was the result of a pervasive

---

4. References in parentheses indicate an evidentiary source for the preceding factual finding or findings. "PX" refers to a plaintiffs' exhibit; "DX," to a defendants' exhibit; "JX," to a joint exhibit; and a proper name, to the testimony of the named individual.

disenchantment with the mayor–alderman form of government, which had been subject to much alleged abuse, culminating in 1954–55 in widespread allegations of scandal and corruption. The then increasingly popular city manager form was adopted with the idea that it would bring nonpolitical, nonparochial, professional management to the city and would create a better city for all residents of Little Rock. (DX 54, PX 12, Warren Baldwin, Jr., Byron Morse, Jack Murphy). In this regard, it is revealing that 57% of those voting in the "Black Voting Area," described below, voted *for* the adoption of the city manager form of government. (DX 2).

The plaintiffs rely on events and legislation *following* the Little Rock school crisis in 1957–59 as evidencing a racist attitude which could have affected the city manager form of government election in 1956. But there was no evidence that, before or during the election in 1956, there were any apparent racial tensions in Little Rock, and it is clear that no racial considerations entered into the public debate on the form of city government desired by the people. This "reform" proposal was supported by a sizeable majority of both the black and the white voters of Little Rock.

The plaintiffs have also suggested that the city Board of Directors were somehow responsible for certain alleged post–1957 manifestations of discrimination in areas such as public and private schools, public and private housing, public and private employment, population movements, and state and federal highway and expressway decisions, without showing by any competent evidence any nexus between the claimed acts of discrimination and the city Board of Directors. While claiming that the city directors in effect controlled the decisions of completely independent entities in this respect, plaintiffs also suggest that an unofficial "shadow government" of some kind composed of the members of a private organization known as Fifty for the Future "runs the town." Once again the Court,

while understanding how one might come by such a belief, surmise, or opinion, notes that there is no competent evidence in this record to support such views. The Court heard the testimony of many past and present city directors. There was no evidence that any were controlled or manipulated by any behind the scenes group.

In this regard, the plaintiffs also claim that a group known as the "Good Government Committee" has controlled elections to the Board of Directors in a racially discriminatory manner by "slating" certain candidates for city director and by supporting only white candidates. The Good Government Committee was active in supporting the change to the city manager form of government in Little Rock in 1956 and in soliciting and publicly supporting qualified candidates for city director in the 1950's and the 1960's. It did not employ racial campaign tactics, and there is no evidence to indicate that it was influenced or motivated by racial considerations. Furthermore, the Committee, if it still exists, has apparently not been active or influential in recent city director elections.

2. The population of Little Rock is approximately 30% black and 70% white. (DX 17).[5]

3. The parties have estimated that the voting age population of Little Rock is approximately 20% black and 80% white. (John W. Walker, Defendants' Post–Trial Brief). Based on the census data in evidence, the Court finds that this is a reasonable estimate. (JX 29–32).

4. Little Rock is characterized in large part by segregated residential housing patterns. That is, many neighborhoods are substantially occupied by citizens of only one race.

Approximately 90% of the black population of Little Rock lives in an identifiable geographic area referred to by the parties to this litigation as the "Black Voting Area" or "BVA." The population of each precinct in the BVA is at least 50% black.

**5.** Population information is derived from the 1974 Special Census of the United States if the

relevant data are available, and otherwise, from the 1970 census.

The overall population of the BVA is over 75% black, and most of the BVA precincts appear to be over 85% black. The BVA includes precincts numbered 39, 40, 41, 42, 43, 47, 49, 50, 51, 59,[6] and 60. It has a black population of about 35,000, or approximately 25% of Little Rock's total population. (JX 17, JX 19, JX 31, JX 32).

5. Although they possess a variety of political views, the black residents of the BVA have tended to share certain common political, economic, and societal interests. That is, the BVA population has generally tended to comprise a cohesive and unified political force with respect to the predominant concerns of BVA residents.

6. BVA residents generally "bloc" vote for the black candidate for city director in races involving one black candidate and one or more white candidates. This phenomenon is not, however, absolute, as evidenced by the facts that Lt. Col. Ralph White, a black candidate, received only 42% of the BVA vote in his race for city director and that Dr. Frank James, a black, and other black candidates have been consistently defeated by Dr. Robert Johnston, a white candidate, in elections for State Representative from District 3, a multi-member state legislative district that includes most of the BVA and is approximately 59% black. Thus, the Court finds that factors other than race, such as name recognition, reputation, and political philosophy, play at least some part in the strength of the support a candidate receives from the BVA. (PX 21, DX 53, JX 19, Dr. W. H. Townsend).

7. The evidence does not establish bloc voting in the "non-BVA" areas of the city, at least since 1968, although it is true that no black has yet received a majority of the non-BVA votes. In fact, the evidence suggests strongly that race has not been a controlling factor in city director elections in the "white" voting areas since then. The Court finds that other factors, such as name recognition, reputation, political philosophy, stands on various issues, age, and experience, play a dominant role in non-BVA voting, even when the choice is between a black candidate and one or more white candidates. The percentages of the non-BVA vote received by the black candidates (set forth below) substantiate this finding.

Also relevant in this regard is the testimony of Dr. W. H. Townsend, one of the plaintiffs, who serves as a State Representative. His constituency is approximately 59% black and 41% white. Dr. Townsend, who has been running for political office for about twenty years, described significant changes in attitudes during that time. He stated that while it was difficult for a black to campaign among whites in the early 1960's, it is much easier to do so now. He indicated that the "climate" of the community was different now from that in the early 1960's; that his election campaigns reach all the voters, black and white; and that whites attend meetings at which he speaks as a State Representative or as a candidate.

8. The results of the contested city director elections involving black candidates are as follows (winner underlined and race indicated by a "b," for black, or a "w," for white) (JX 20–28):

|  | 1962 | | | |
|---|---|---|---|---|
|  | BVA % | Non-BVA % | BVA Total | Non-BVA Total |
| Jones (w) | 10.08% | 19% | 326 | 3,627 |
| Henson (w) | 15.87% | 63% | 513 | 12,132 |
| Townsend (b) | 74.04% | 18% | 2,393 | 3,380 |

---

6. Precinct 59 appears as a BVA precinct on Joint Exhibit 19, a map, although it has been omitted, apparently inadvertently, from the stipulated lists in Joint Exhibit 33 of BVA precincts and non-BVA precincts.

| 1966 | | | | |
|---|---|---|---|---|
| | BVA % | Non-BVA % | BVA Total | Non-BVA Total |
| Baldwin (w) | 12.5% | 47% | 547 | 9,358 |
| Smith (w) | 7.9% | 27% | 345 | 5,366 |
| Townsend (b) | 79.4% | 26% | 3,454 | 5,181 |

| 1968 (Position 5) | | | | |
|---|---|---|---|---|
| | BVA % | Non-BVA % | BVA Total | Non-BVA Total |
| Bussey (b) | 84.3% | 36% | 2,898 | 9,327 |
| Harris (w) | 7.3% | 30% | 252 | 7,728 |
| Keys (w) | 8.3% | 34% | 286 | 8,759 |

| 1968 (Position 6) | | | | |
|---|---|---|---|---|
| | BVA % | Non-BVA % | BVA Total | Non-BVA Total |
| Bass (b) | 67.4% | 11% | 1,669 | 3,099 |
| Burks (w) | 11.8% | 22% | 293 | 5,974 |
| Dillaha (w) | 12.0% | 45% | 298 | 12,194 |
| Taney (w) | 8.6% | 22% | 215 | 6,003 |

| 1972 | | | | |
|---|---|---|---|---|
| | BVA % | Non-BVA % | BVA Total | Non-BVA Total |
| Cooper (w) | 3.0% | 11% | 107 | 3,037 |
| Hinson (w) | 17.7% | 36% | 618 | 9,858 |
| Hodge (w) | 3.1% | 13% | 111 | 3,520 |
| Hollingsworth (b) | 71.6% | 31% | 2,496 | 8,702 |
| Jackson (w) | 4.3% | 9% | 152 | 2,565 |

| 1974 | | | | |
|---|---|---|---|---|
| | BVA % | Non-BVA % | BVA Total | Non-BVA Total |
| Cummings (w) | 1.2% | 2% | 44 | 458 |
| Dailey (w) | 20.7% | 50% | 716 | 14,731 |
| Hardin (w) | 2.6% | 3% | 92 | 781 |
| Horne (w) | 12.4% | 34% | 430 | 10,059 |
| Shackelford (b) | 62.8% | 11% | 2,171 | 3,206 |

| 1976 (Position 3) | | | | |
|---|---|---|---|---|
| | BVA % | Non-BVA % | BVA Total | Non-BVA Total |
| Mehlburger (w) | 38.5% | 69% | 960 | 18,695 |
| Williams (b) | 61.4% | 31% | 1,532 | 8,227 |

| 1976 (Position 5) | | | | |
|---|---|---|---|---|
| | BVA % | Non-BVA % | BVA Total | Non-BVA Total |
| Bussey (b) | 77.7% | 33% | 3,494 | 9,855 |
| Cummings (w) | 11.4% | 19% | 517 | 5,573 |
| Wellons (w) | 10.7% | 48% | 485 | 14,364 |

| 1976 (Position 6) | | | | |
|---|---|---|---|---|
| | BVA % | Non-BVA % | BVA Total | Non-BVA Total |
| Castleman (w) | 11.1% | 39% | 441 | 11,252 |
| Hendrix (b) | 73.7% | 24% | 2,907 | 7,024 |
| Shelby (w) | 15.0% | 37% | 592 | 10,526 |

| 1976 (Position 7) | | | | |
|---|---|---|---|---|
| | BVA % | Non-BVA % | BVA Total | Non-BVA Total |
| Ferstl (w) | 29.6% | 37% | 1,094 | 12,102 |
| Jones (w) | 28.5% | 50% | 1,053 | 16,335 |
| White (b) | 41.8% | 13% | 1,547 | 4,070 |

|  | 1978 |  |  |  |
|---|---|---|---|---|
|  | BVA % | Non-BVA % | BVA Total | Non-BVA Total |
| Bussey (b) | 83.4% | 41% | 2,558 | 8,055 |
| Cummings (w) | 6.61% | 18% | 203 | 3,533 |
| McHughes (w) | 9.65% | 41% | 296 | 8,175 |

9. The result of the bloc voting phenomenon in the BVA and the lack thereof in the non–BVA is that the BVA has the potential for exerting more influence under the plurality at–large method of electing city directors than it would under a single–member–district system. This is so because, in a race involving one black candidate and two or three or more white candidates, the BVA bloc vote for the black may give him or her a higher total than any one of the whites has, assuming the non–BVA votes are fairly evenly spread. This result may also occur if only one white is in the race. Since the elections are by plurality on the basis of the first ballot, rather than by majority in a run–off, such a result would give the black candidate the election because of the bloc voting BVA support.

Although the present system has not resulted in more than proportionate representation by blacks on the Board of Directors, the BVA support made the difference in the election of two black candidates, Director Hollingsworth in 1972 and Director Bussey in 1978. (JX 25, JX 28). Also, the following white candidates supported by at least a plurality of the BVA have been elected: Director Winder (1962), Director Binder (1964), Director Wimberly (1968), Director Morse (1968), Director Baldwin (1970), Director Young (1972), Director Linkous (1974), Director Keith (1978), Director Langston (1978). (JX 20–28).

Additionally, the black community was largely responsible for causing an election to be held regarding whether to accept the Board–approved ordinance awarding Little Rock's exclusive cable television franchise to a company unpopular with blacks generally. The BVA voted overwhelmingly against the ordinance, and the non–BVA voted against the ordinance by a slimmer margin. The election was a reflection of the effectiveness of black leadership and black political strength in city politics. (DX 11).

After the public election defeating the ordinance, a consortium of black groups reached an agreement with the company which had first been awarded the franchise and which had been disapproved by the voters in the election. The agreement provided for the consortium to support the company's attempts to regain the franchise and for concessions by the company to the consortium. Thereafter the city Board of Directors awarded the franchise to another company. The plaintiffs argue that the Board's decision in this regard evidenced racial discrimination. The Court finds that no racial discrimination was involved in the Board's final awarding of the franchise. Rather, the decision not to award the franchise to the company then supported by the black consortium was made in good faith and was based in large part on the public's rejection of the same company in the election shortly before.

10. Racial campaign tactics have not been used in campaigns for positions on the Little Rock Board of Directors.

11. Successful white candidates for city director have generally considered support of the black community important and have actively campaigned to gain that support through personal appearances, signs, media, or other means. (DX 45, DX 46, testimony of past and present directors).

12. There has been no group controlling access to the ballot for positions on the Board of Directors since the city manager form of government was implemented in 1957. The only requirements for gaining a position on the ballot are that one obtain the signatures of fifty registered voters of

Little Rock on a petition and pay a one–dollar filing fee.

13. From 1957 to the present there have been 107 candidacies for positions on the Board, of which 95 have been made by whites and 12 by blacks. The 95 white candidates have been involved in 44 contests, and the 12 black candidates have been involved in 12. Black candidates have won three contested elections and one uncontested election. (JX 33).

14. The black candidates for the Board have been:

W. H. Townsend–1962 (defeated)
W. H. Townsend–1966 (defeated)
Charles Bussey–1968 (elected)
Harry Bass–1968 (defeated)
Charles Bussey–1972 (elected unopposed)
Perlesta Hollingsworth–1972 (elected)
Lottie Shackelford–1974 (defeated)
Charles Bussey–1976 (defeated)
Erma Hendrix–1976 (defeated)
Paul Williams–1976 (defeated)
Ralph White–1976 (defeated)
Charles Bussey–1978 (elected)

(JX 33).

15. Lottie Shackelford, a black, was appointed to the Board by the other directors to fill the unexpired term of James Wellons, a white, on September 19, 1978. She will serve through December 31, 1980. (DX 9, DX 10). Directors Hollingsworth and Bussey, both black, were elected by the city directors to serve terms as Assistant Mayor. (DX 5, DX 6, DX 7).

16. Since 1969, the racial composition of the Board has been as follows:

| 1969 | 1 Black | 6 White |
|---|---|---|
| 1970 | 1 Black | 6 White |
| 1971 | 1 Black | 6 White |
| 1972 | 1 Black | 6 White |
| 1973 | 2 Black | 5 White |
| 1974 | 2 Black | 5 White |
| 1975 | 2 Black | 5 White |
| 1976 | 2 Black | 5 White |
| 1977 | 0 Black | 7 White |
| 1978: | | |
| 1/1–9/19 | 0 Black | 7 White |
| 9/19–12/31 | 1 Black | 6 White |
| 1979 | 2 Black | 5 White |
| 1980 | 2 Black | 5 White |

(JX 33, DX 12).

17. Since 1969, blacks have served 16.25, or 19.3%, of the 84 position–years on the Board. This is roughly proportionate to their estimated presence in the voting age population (20%).

18. Of the 219,329 votes cast between 1972 and 1980 in elections involving black candidates, 24,626, or 11.2%, were cast by residents of the BVA. During the same period, blacks served for 12.25 of 56 position–years, or 21.9% of the representation on the Board.

19. The city and the Board have been responsive to the interests, needs, and demands of the black community in Little Rock. (DX 31, DX 33, Nathaniel Hill).

20. Before 1967, there were no blacks on any Little Rock boards or commissions, except for two boards, the members of which were all black. Since 1967, the Board has appointed blacks to city boards and commissions regularly. In 1977, 17.6% of those appointments were black, and in 1978, 14.7% were black. In 1977, 13.7% of the members of the boards and commissions were black, and in 1978, 13.3% were black. In addition, the Board appointed a black to fill a vacancy on the Board of Directors in 1978 and appointed a black to the City Manager position in 1980, as previously noticed. (DX 23, DX 24, JX 33).

21. In 1974, the Board formally adopted Equal Employment Personnel Policies for the city. (DX 20). In 1977, the Board adopted an affirmative action plan regarding employment by the city. This plan was amended in 1979, with specific hiring goals. (DX 19).

22. ·In 1977, the Board adopted the goal that 50% of its appointments to city boards and commissions would be other than white males. (Don Mehlburger, Mike Castleman, Mahlon A. Martin).

23. The number of black citizens attending public meetings of the Board of Directors is about the same as the number of white citizens attending. (Don Mehlburger, Mahlon A. Martin.)

24. The federal Model Cities Program required that interested cities apply for participation before receiving federal funds under the program. Little Rock took affirmative steps to apply for participation in the Model Cities Program. The city received some $17 million through this program, all of which was spent in the BVA. (DX 39, Jack Murphy, Nathaniel Hill).

25. Little Rock has also received federal Community Development Block Grant (CDBG) funds which have been spent in the nine CDBG areas, seven of which are over 50% black. The other two CDBG areas, John Barrow and Oak Forest, are in excess of 30% black. The city also spent $119,000 in CDBG funds near University Park. This expenditure benefits the black community, since the resulting facility is readily accessible to residential areas with substantial black populations. (DX 26–30, Nathaniel Hill).

26. Approximately $30 million in Model Cities and CDBG funds have been spent, all in predominantly black areas or in areas having significant black populations. (DX 26–30).

27. The City of Little Rock has complied in all respects with the Model Cities and CDBG program requirement that federal monies from these programs not be used to replace local funds or to carry out projects traditionally paid for with city funds. The majority of the Model Cities and CDBG funds were used for the construction of streets, curbs, sidewalks, and drainage, which have traditionally been funded by developers or special improvement districts rather than by the city. The city has the responsibility for the maintenance and repair of these projects once constructed. (Nathaniel Hill).

28. Overall, the predominantly black areas of Little Rock have received far more than their proportionate share of funds and services controlled by the decisions of the city's Board of Directors. It is at least arguable that this phenomenon would be less likely to occur if directors were elected from single–member districts, since each director, having essentially only a district-wide (not city–wide) constituency, would presumably feel obligated to see that his or her district received an equal share of services and funds, at least to the extent permitted by law.

29. CDBG program regulations initially permitted the use of CDBG funds outside poor–to–moderate income areas for any purpose which would benefit residents of those areas or would eliminate a blighting influence. Some cities used this "loophole" for building convention centers and for business district development. Little Rock did not use the money in this way but spent virtually all of it in the CDBG areas. (Mahlon A. Martin, Jim Hathcock, Nathaniel Hill).

30. The Model Cities and CDBG programs required some form of citizen participation in the allocation of funds. Little Rock developed citizens' committees which helped determine the projects to be undertaken. A majority of the members of these committees are residents of CDBG (or Model Cities) areas. They effectively control project determinations. The Board has generally allocated the money as recommended by these groups. (DX 33, Mahlon A. Martin, Nathaniel Hill).

31. Little Rock had to affirmatively seek the participation of the citizens of the Model Cities and CDBG areas and to overcome the residents' initial suspicions about the programs. City employees were sometimes physically and verbally abused in soliciting this participation. (DX 55). Nevertheless their efforts to establish citizen participation were successful. (Mahlon A. Martin, Nathaniel Hill).

32. The black citizens of Little Rock have an active, viable, and effective participation in the processes and affairs of local government.

33. Projects to be funded by general revenue bonds issued by the city are chosen upon the basis of accepted engineering and traffic data and according to the accepted professional standards for such projects. The plaintiffs have alleged that a bond issue which was approved in 1976 was ra-

cially discriminatory in that much of the revenue from the bond issue was used in non–BVA areas of the city. When the bond issue was approved by the Board, there were two black members of the Board of Directors. Both black directors, Mr. Bussey and Mr. Hollingsworth, voted to approve the projects to be paid for by the bond money. Further, a majority of those voting in the BVA voted to approve each of the five separate parts of the bond issue. (DX 3, DX 4, Ron Young).

34. Evidence of the city's and the Board's responsiveness to the black community in Little Rock includes the following:

a. the establishment of Martin Luther King's birthday as a city holiday; (DX 18);

b. the paying of $50,000 out of the General Fund so that the exterior of the East Little Rock Community center could be brick, as the citizens wanted, rather than cedar; (Nathaniel Hill);

c. the holding of Board meetings in various neighborhoods to aid citizen participation;

d. the changing of the prohibition on alley garbage pick–up to permit it where possible; (Webster Hubbell);

e. the allocation of federal "312 loans" for housing rehabilitation to the black community; (Jim Hathcock);

f. the limitation of the housing rehabilitation and concentrated housing code enforcement to predominantly black and lower income neighborhoods; (Jim Hathcock, DX 42);

g. the establishment of the Street Crimes Unit by the Little Rock Police Department in response to the demands of black citizens; (DX 31);

h. the establishment by the city, as early as 1969, of a recruitment officer to solicit minority applicants; (Mahlon A. Martin);

i. the city's success in finding permanent positions for persons (most of whom are black) temporarily placed with the City for training through the New Careers and CETA programs; (Mahlon A. Martin);

j. the resolution of the Board supporting busing and total integration of Little Rock schools; and

k. the Board's decision to appeal the Civil Service Commission's decision to reinstate the policeman involved in the high speed chase and shooting death of a black man.

## LEGAL ANALYSIS–CONCLUSIONS OF LAW

■ Applying the various legal analyses discussed in the section entitled "Development of the Law," *supra*, the Court concludes that the plaintiffs are not entitled to relief. Any statement in this opinion deemed to be a conclusion of law is adopted as such.

Under the general standard of *Whitcomb v. Chavis, supra*, 403 U.S. 124, 91 S.Ct. 1858, 29 L.Ed.2d 363, which was rearticulated in *White v. Regester, supra*, 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314, the plaintiffs are not entitled to relief, since they have not demonstrated that they have less opportunity than other citizens or groups of citizens to participate in the political processes of Little Rock and to elect city directors of their choice. Rather, the Court concludes, on the basis of all the evidence, that they have the same opportunity as other citizens of Little Rock to participate in the political processes and to elect directors of their choice.

With regard to the specific factors identified in *White v. Regester*, 412 U.S. at 766–67, 93 S.Ct. at 2339–40, the Court notes that:

(1) Arkansas and Little Rock have a history of official race discrimination;

(2) a majority vote is not required to be elected to the Board of Directors; no primary election is required; and access to the ballot is readily and easily accessible to all;

(3) candidates run for a particular position, but since they are elected by a plurality, a head–to–head contest is not inevitable;

(4) for over a decade blacks have commonly served on the Board of Directors;

(5) support by blacks may be necessary to win elections and to accomplish various political objectives in Little Rock;

(6) there is no committee which controls access to the ballot, and the Board of Directors has exhibited good–faith concern for the needs of the black community;

(7) no racial campaign tactics have been employed; and

(8) the black community is not excluded from the political process.

After assessing these factors, the Court concludes that the plaintiffs are not entitled to relief under the standard of *White v. Regester.* It is important to note that the old aldermanic system was considerably worse under this standard than is the present system, in that it created head–to–head contests requiring a majority vote for each position and provided much less in services and funds to the black community.

Although a majority of the Supreme Court rejected the Fifth Circuit's *Zimmer* analysis as conclusive in *Mobile v. Bolden,* 446 U.S. at 69–74, 100 S.Ct. at 1501–1503, 1511, the plurality acknowledged that the presence of the indicia relied upon in *Zimmer* may be some evidence of unconstitutional discrimination. *Id.* at 74, 100 S.Ct. at 1503. Even under the *Zimmer* analysis, which is not itself sufficient to prove unconstitutional discrimination, the plaintiffs have not made the required showing of indicia of discrimination.

(1) Blacks have complete accessibility to Little Rock's political processes and to candidacy for city director positions.

(2) The Board of Directors has been responsive to the "particularized interests" of the black community of Little Rock.

(3) While the State does not have a strong policy of at–large districting for municipal elections, the City of Little Rock does have a strong policy in this regard, which grew out of the city's bad experience with the ward system before 1957.

(4) Past discrimination does not have a significant adverse effect upon blacks'

participation in the election system in Little Rock.

(5) The "district" under consideration is large.

(6) Only a plurality is needed for election.

(7) Positions are contested for individually.

(8) Candidates need not reside in subdistricts.

*See Nevett v. Sides, supra,* 571 F.2d at 217. *None* of the "primary" factors in this case, items (1) through (4), *id.,* tends to establish discrimination.

Without enumerating again all the factors identified in *Dove v. Moore, supra,* 539 F.2d 1152, and in *Dove v. Bumpers, supra,* 364 F.Supp. 407, the Court concludes that none of those factors, when applied to the evidence in this case, supports the plaintiffs' claim of discrimination. Only bloc voting by BVA residents would be a relevant positive factor, and this phenomenon is offset by the lack of bloc voting in the non–BVA.

The *Bolden* plurality required proof of purposeful discrimination to sustain a voting strength dilution challenge. 446 U.S. at 61–65, 100 S.Ct. at 1497–1499. The evidence in this case overwhelmingly negates any claim of purposeful discrimination in the creation or operation of the present system in Little Rock. The clearest mandate that this Court has comes from the fact that the evidence in the very recent *Bolden* case was much stronger in support of a claim of racial discrimination than is the evidence in the case *sub judice.* Nevertheless, the Supreme Court held that it was not sufficient to support the lower courts' conclusions that the Mobile system was unconstitutional. Given the result in *Bolden,* this Court could not sustain the plaintiffs' claim of unconstitutional discrimination.

It has been argued that Justice Stevens' approach in *Bolden* should be used in assessing the plaintiffs' claim. When the three factors he identified are applied to the evidence in this case, it is also clear that the plaintiffs cannot prevail.

(1) The "district" in this case, which is coextensive geographically with the City, is not "uncouth," but is rather "the product of a routine or a traditional political decision."

(2) It is questionable whether the present system has any adverse impact on blacks in Little Rock.

(3) The creation and operation of the system are supported by neutral justifications and are not irrational or motivated by a desire to curtail the political strength of blacks in Little Rock.

See Bolden, 446 U.S. at 88, 100 S.Ct. at 1511. Furthermore, in his opinion, Justice Stevens concluded that the Mobile system was constitutional, even though it did adversely affect blacks in that city. In the case sub judice, the evidence does not even clearly establish an adverse impact on the blacks in Little Rock. Therefore, were Justice Stevens' approach adopted as the appropriate analysis in cases such as this, the plaintiffs would not be entitled to relief.

In Bolden, Justice Marshall would have required only proof of discriminatory impact to sustain a claim of unconstitutional voting strength dilution. 446 U.S. at 101, 100 S.Ct. at 1518. Even under this approach, which has been rejected by most justices of the Supreme Court as too far–reaching, it is not clear that the plaintiffs could prevail. The Court has found no significant adverse impact on blacks in Little Rock, and it is not clear that any adverse impact actually results from the present system of electing city directors. Therefore, under any theory which has been advanced in cases of this type, the plaintiffs have not carried their burden of proving that Little Rock's system for electing city directors unconstitutionally dilutes the voting strength of blacks in the City.

For the reasons stated in this Memorandum Opinion, the complaint will be dismissed, and the relief requested will be denied.