Robert J. SMITH, M.D., H.O. Gray, Marion A. Humphrey, W.R. Wright, Henry Johnson, Naomi N. Lawson and Marsha Flowers, Plaintiffs,

v.

CITY OF PINE BLUFF; Mayor Carolyn Robinson; City Council Members, Bob Atkinson, Vic Brown, Walter Triplett, Chester Hynes, Philip Chavis, Jerry Taylor, Jerry Moore, and Ronnie Roller, Defendants.

No. PB-C-83-342.

United States District Court,
E.D. Arkansas,
Pine Bluff Division.

May 22, 1986.

P.A. Hollingsworth, Hollingsworth & Heller, Little Rock, Ark., C. Lani Guinier, New York City, for plaintiffs.

Robert Tolson, Jr., City Atty., City of Pine Bluff, Ark., Pine Bluff, Ark., for defendants.

MEMORANDUM OPINION

HENRY WOODS, District Judge.

*Preliminary Statement*

This suit was filed on September 14, 1983 by a number of black citizens of Pine Bluff, Arkansas for declaratory and injunctive relief against at-large voting for members of the Pine Bluff City Council. The statutory and constitutional bases were stated to be the Voting Rights Act of 1965, 42 U.S.C. § 1973, and Amendments Fourteen and Fifteen of the United States Constitution.

The complaint alleges that according to the 1980 census, the population of the City of Pine Bluff is 50.36% white and 49.63% black and the voting population is 55.2% white and 44.7% black; that Pine Bluff has a long history of discrimination; and that voting is racially polarized. The at-large voting system, according to the complaint,

denies plaintiffs "an opportunity to participate in the political process and to elect candidates of their choice." An injunction has been prayed against at-large elections, and declaratory relief has been sought under the above-noted statute and constitutional provisions.

In the answer filed October 4, 1983, the defendants pleaded *res judicata* inasmuch as the Court of Appeals for the Eighth Circuit in *Dove v. Moore,* 539 F.2d 1152 (8th Cir.1976) had affirmed a holding by U.S. District Judge Oren Harris that at-large elections in Pine Bluff were not violative of any of the statutes or constitutional provisions relied on by plaintiffs. On the basis of this decision, defendants moved for summary judgment on November 21, 1983. After plaintiffs were granted additional time to respond, on February 8, 1984, I denied the motion on the ground that recent legislative and judicial developments might presage a different result from that reached in *Dove v. Moore, supra.* However, the suit was not maintained as a class action because no motion for class certification was filed within 90 days after filing the complaint as required by the local rules. In the November, 1984 election an initiated act was placed on the ballot which called for the election of aldermen by wards in the City of Pine Bluff. The vote was 5594 to 4352 in favor of the proposal. On February 25, 1985 defendants moved to dismiss the complaint as moot.

On April 24, 1985 plaintiffs filed a supplemental complaint which restated the allegations in the original complaint and included a paragraph concerning the adoption of the initiated act.

On June 3, 1985 another supplemental complaint was filed which contained the additional allegation that "on information and belief" the City Council is considering a redistricting plan that fails to give consideration to the rights of the black population. This complaint was answered on June 12, 1985 by defendants, who again raised the mootness issue. Defendants pointed out that no redistricting plan had

been promulgated and any allegations as to its provisions would be purely speculative.

I found that the matter had become moot with the abrogation of at-large voting which was the thrust of the litigation and on December 5, 1985 granted the motion to dismiss. Since no redistricting plan had yet been adopted, I felt that the allegations in the supplemental complaint were purely speculative. By way of relief, plaintiffs had requested that the Court fashion a redistricting plan and order it into effect to avoid any potentially unfavorable plan that the Council might develop. Such an approach, in my opinion, would be highly undesirable and not in accord with existing legal precedents. It was my feeling that when the Council developed a plan, new litigation could be instituted if it did not meet statutory and constitutional standards. I did not feel free to speculate about the content of such a plan. On January 15, 1986 plaintiffs noticed an appeal to the Court of Appeals from my order of dismissal. On January 20, 1986 the Council adopted a redistricting plan. On April 11, 1986 the Eighth Circuit Court of Appeals ordered this court to reinstate the plaintiffs' cause of action to permit an amendment to the complaint and to hold a hearing as to whether the May 27, 1986 election should be enjoined. The amended complaint filed May 9, 1986 alleges that the Council's redistricting plan was adopted to dilute minority voting strength. The plaintiffs pray that the May 27, 1986 primary be enjoined and that another election be held "pursuant to a fairly drawn, single member district plan." The hearing ordered by the Court of Appeals was held on May 13, 1986 and after hearing the testimony and considering the briefs filed herein, I make the following findings of facts and reach the following conclusions of law.

### Findings of Fact

1. The City of Pine Bluff is a political subdivision of the State of Arkansas. According to the 1980 census, Pine Bluff has a population of 56,206 of whom 28,430 (50.5%) are white and 27,776 (49.4%) are

black. (PX 4). The 1980 census further reveals that the voting age population was 39,396 of whom 21,753 (55.2%) were white and 17,643 (44.8%) were black (PX 4). These figures are not now precisely accurate because Pine Bluff has annexed an area containing 6,737 people of whom 73% are white. A computation including percentages in the newly annexed area shows the present population breakdown in Pine Bluff to be 53% white and 47% black. On the basis of these additional numbers from the annexed areas, the voting population breakdown would be approximately 58% white and 42% black. Voting age population statistics are "probative because they indicate the electoral potential of the minority community." *City of Rome v. United States*, 446 U.S. 156, 186 n. 22, 100 S.Ct. 1548, 1566 n. 22, 64 L.Ed.2d 119 (1980).

2. The City of Pine Bluff is governed by a mayor and an eight (8) member council. Until the passage of an initiated act in the 1984 election, the city was divided into four (4) wards. The ward lines had not been changed since 1920. Voting for members was at-large, although an alderman had to run from the ward wherein he resided. Two aldermen were elected from each of the four wards.

3. A majority vote is required to win in the primary and general election. (Answer, ¶ 27).

4. On August 5, 1985 the Council met and specifically addressed the problem of redistricting. Chester Hynes, a black member of the Council, was designated Chairman of the Committee of the Whole to receive input from the public and to hold public hearings on proposals.

5. The Council adopted four criteria for the plan: (1) substantially equal population in the wards; (2) no splitting of precincts; (3) no dilution of the voting strength of minorities; and (4) no packing of minorities into a single ward.

6. The City Planning Director was requested to give an opinion as to the procedure to be followed in formulating a plan. He responded by a memo of August 19, 1985 suggesting that the Council Commit-

tee of the Whole have three public meetings for suggested plans and comments.

7. Public meetings were held on September 9, 1985, September 23, 1985, and October 14, 1985 after public notice. At these meetings which were attended by a number of black community leaders, maps, literature, the attorney general's opinion, and other material were distributed. Although there were comments made about the general outline which any plan should follow, only one specific plan was submitted. On October 14, 1985 at the last meeting, Reverend Leotis Strong, a black minister, submitted a plan which was referred to the Planning and Development Committee of the Council under whose jurisdiction the redistricting responsibility would fall. Rev. Strong's plan was submitted to the Planning Director for a demographic analysis.

8. The analysis by the planning department revealed that Rev. Strong's plan had a substantial variation in population between wards. Drawing upon certain features of the Strong plan, Alderman Walter Triplett proposed a plan—2(b)—which eventually was accepted with modification by the Council.

9. The Planning and Development Committee of the Council held three more meetings in November and December at which additional proposals, suggestions, and comments were received. Several more plans were received and considered, including one more by Reverend Leotis Strong, who had submitted the first proposal. Rev. Strong subsequently withdrew his last proposal and indicated that Plan 2(b) would be acceptable if some more blacks were added to the First Ward. Alderman Triplett testified that this change was made in plan 2(b) before its final adoption by the Council which occurred on January 20, 1986.

10. By using census data which breaks down the population by age groups, it is possible to take the 1980 census figure and by interpolation from the age breakdown arrive at the 1985 voting age makeup of the four Pine Bluff wards established in

plan 2(b). I accept these figures as being substantially correct. They are as follows:

|         | White | Black |
| ------- | ----- | ----- |
| Ward 1  | 44%   | 56%   |
| Ward 2  | 74%   | 26%   |
| Ward 3  | 56%   | 44%   |
| Ward 4  | 35%   | 65%   |

To summarize, there are now two wards in which blacks have a majority with the real potential of electing one-half of the City Council. One ward is overwhelmingly white and one is overwhelmingly black. The other two wards are equally balanced. One is slightly more black; the other is slightly more white. With a voting population which, with the recent annexation, is now 58%–42% white, the racial breakdown in the wards does not represent a dilution of black voting strength.

11. Therefore, I find the criteria established by the Council has been fairly met: (1) there is no suggestion that the wards are not balanced population-wise so as to meet the constitutional one-man, one-vote test; (2) the precincts have not been split; (3) there has not been a dilution of minority voting strength; and (4) minorities have not been packed into one ward.

12. Plaintiff also complains about the effect of the redistricting plan on the staggered terms of the aldermen. Under the present Arkansas statutes, terms are staggered so that one-half of the Council is elected at one time. In response to a query to the Attorney General as to how the terms of office of current aldermen would be affected by a realignment of existing wards, the Attorney General responded as follows on December 27, 1984 by quoting the following statute (PX 7):

> When wards are reapportioned so as to increase the number of wards or readjust wards so that such wards contain nearly equal population, the aldermen who remain in their old ward or part thereof shall continue in office. Ark.Stat.Ann. § 19–1007 (1980 Repl.).

I find that the election of May 27, 1986 is being held in accordance with the Attorney General's interpretation of the above statute. If an alderman has time left on his term and he retains residence in the same ward, he does not have to run. If his ward is changed, he has to run. To shorten the terms of city council members who were elected previously, as suggested by plaintiffs, would violate the above statute as interpreted by the Attorney General. Plaintiffs claim this statute is not applicable; but in establishing election procedures for a state election, the responsible officials have a right to rely on an opinion of the Attorney General.

13. Much of plaintiffs' testimony was devoted to establishing that the vote in Pine Bluff is racially polarized. Statistical proof was introduced to demonstrate such polarization. There is undoubtedly some racial polarization of the vote in Pine Bluff. However, there are indications that there have been a number of occasions when there was cross-racial voting in large numbers. The Court of Appeals examined this matter at great length in *Dove v. Moore, supra,* because this was the principal ground for attack on the at-large voting system. Indeed, this issue would have much more relevance in an attack on at-large voting which no longer exists in Pine Bluff. The Court of Appeals cited examples in Pine Bluff where whites had received black support against black candidates and blacks had received white support against white candidates. 529 F.2d at 1153–54. The court also pointed out that on several occasions when blacks were defeated for aldermen in Pine Bluff, they were running as Republicans or Independents. One of the complaints made by plaintiffs herein was that Alderman Chester Hynes, a veteran member of the Council, was now forced to run in a majority white ward. However, Alderman Hynes has attracted substantial support from white voters in the past. The Court of Appeals noted as follows:

> In the 1974 election, Alderman Hynes faced white opposition. The voters adhered to Pine Bluff's "re-election" tradition and elected incumbent Hynes. He received substantial and crucial votes from white voters. For example, in

Ward 3, which is 99.6 percent white and contains approximately 40 percent of the entire white population of Pine Bluff, he received 44.5 percent of the vote. *Id.* at 1153. Perhaps the best argument that Pine Bluff voters are not completely polarized is demonstrated by the fact that a clear majority of the voters favored abrogation of at-large voting, thereby agreeing with the position of the black community.

### Conclusions of Law

1. The one-person, one-vote requirement applies to City Councils. *Ellis v. Baltimore,* 352 F.2d 123 (4th Cir.1965). The ward realignment here meets this test. *Reynolds v. Sims,* 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1962); *White v. Regester,* 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973).

2. There is no constitutional or statutory requirement that districts be drawn in a manner which guarantees that minority voters are able to elect representatives in proportion to their population. This idea was specifically rejected in *Mobile v. Bolden,* 446 U.S. 55, 100 S.Ct. 1490, 64 L.Ed.2d '7 (1980). "The Equal Protection Clause of the Fourteenth Amendment does not require proportionate representation as an imperative of political organization. The entitlement that the dissenting opinion assumes to exist simply is not to be found in the Constitution of the United States." *Id.* at 75–76, 100 S.Ct. at 1504.

3. I do not conclude that the plan adopted by the Pine Bluff City Council impermissibly dilutes the efficacy of the black vote. However, even if such an effect were established with regard to the alleged constitutional violations, plaintiffs have the burden of going forward and proving that the districting plan exists because it was intended to diminish or dilute the political efficacy of the black minority in Pine Bluff. The plaintiffs have not sustained that burden. *Rogers v. Lodge,* 458 U.S. 613, 621, 102 S.Ct. 3272, 3277–78, 73 L.Ed.2d 1012 (1982). Such discriminatory intent is a requisite to a finding of unconstitutional vote dilution under the Fourteenth and Fifteenth Amendments.

4. A different test, however, applies to the Voting Rights Act, 42 U.S.C. § 1973 as amended and extended on June 1, 1982.[1] In *Ketchum v. Byrne,* 740 F.2d 1398, 1403 (7th Cir.1984), the court made the following comment on the amendment:

> The most significant change brought about by the 1982 amendments was to eliminate the requirement of *intentional* discrimination by substituting a "results" test for the "purpose" test imposed by the Supreme Court and by listing the factors to be considered in determining whether on the basis of the "totality of circumstances" the Act has been violated.

The requirements are intended to apply to redistricting plans. *Rybicki v. State Board of Elections,* 574 F.Supp. 1147, 1148 (N.D.Ill.1983). They clearly apply to vote dilution. *Id.* The Senate Judicial Committee listed nine factors which are "typical factors" in determining whether an election structure violates Section 2 of the Voting Rights Act under the "results" test. These factors are listed in *Ketchum v. Byrne, supra* at 1404 n. 5 along with twenty other

---

1. Section 2 as amended states:

(a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race, or color, or in contravention of the guarantees set forth in section 1973b(f)(2) of this title, as provided in subsection (b) of this section.

(b) A violation of subsection (a) of this section is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) of this section in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: *Provided,* That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

factors listed by the Subcommittee on the Constitution of the Senate Judicial Committee. I have examined these factors in light of the evidence in this case and have concluded that on the basis of the "totality of circumstances," the Voting Rights Act has not been violated.

5. There is another consideration. This change from an at-large to a ward election originated as an initiated measure, the most democratic form of legislation, and was approved by the people of Pine Bluff. The districting plan was adopted by a City Council elected by procedures tested and approved by the Court of Appeals in *Dove v. Moore, supra.* A judge should give serious consideration to intervention on the eve of election into election procedure legislated by the people themselves and their elected representatives. Campaigns are presently in progress in three of the wards. Enjoining this election would mean loss of time and money by the candidates which can never be regained. I have concluded that the factors enumerated in *Dataphase Systems, Inc. v. C.L. Systems, Inc.,* 640 F.2d 109 (8th Cir.1981), which govern the issuance of injunctions in this circuit, preponderates in favor of the defendants.